Duarte, J.
*919 A jury found defendant Shauna Marie Burton guilty of two counts of first degree murder and one count of second degree robbery, found true a multiple-murder *37 special circumstance, and found true allegations that defendant used two deadly weapons (a flashlight and a knife). ( Pen. Code, §§ 187, 190.2, subd. (a)(3), 211, 12022, subd. (b)(1).) The trial court sentenced defendant to prison for life without parole plus seven years, and defendant timely filed this appeal.
Defendant contends the trial court improperly admitted evidence about a prior conviction, no substantial evidence supports first degree murder, and the court misinstructed on the use of willfully false prior statements. We shall affirm.
BACKGROUND
There is no serious dispute about whether defendant robbed a pharmacy cashier one morning and later that day killed the elderly victims, Melvin and Jean Bain (hereafter Melvin and Jean) in their trailer. A witness saw defendant go into the trailer to get some pain pills and then heard screaming from the trailer, including defendant saying someone owed her. Bloody prescription bottles and pills were found on a bedroom floor. After her arrest, defendant made many false statements to a detective. At trial she testified Jean caught her and Melvin in flagrante and attacked her, whereupon she defended herself with a flashlight and fled, leaving both victims alive. The jury did not believe her.
A. Trial Evidence
At about 7 a.m. on November 3, 2013, defendant tried to buy condoms at a CVS pharmacy in Rancho Cordova and then (unsuccessfully) tried to rob the cashier by telling her she had a gun. She then left the pharmacy in a red Cadillac with a white top. The store manager recorded the Cadillac's license plate.
Brice Vaughn testified he had been "semi" dating defendant. In early November 2013 he had the Cadillac, although it was registered to his father.
*920 On the evening of November 2, 2013, defendant stayed overnight at his house. The next morning his parents called him about his Cadillac, which was gone. When he called defendant about his car, she told him she was having it worked on. The couple had not been cohabiting at that time.
Vaughn also testified that he had dated defendant for over two years, but in July 2013 she cut him with a box-cutter, she was prosecuted for that act, and they broke up.[1] When defendant arrived at his house on November 2, 2013, that was the first time he had seen her since she had cut him.
An officer sent to a Rancho Cordova mobile home park before noon found Melvin dead and Jean alive but unresponsive. A bloody Maglite flashlight and bloody kitchen knife were found, and a telephone cord had been cut. Two bloody prescription bottles and some loose pills were found on a bedroom floor. A Cadillac found at a nearby apartment complex matched the description of the car seen leaving the pharmacy robbery.
Melvin, aged 78, died of stab wounds to his neck and chest, but also had blunt force head injuries consistent with having been inflicted by a Maglite flashlight. He also had defensive wounds. Jean, also aged 78, died in the hospital 10 days later. She died of blunt force trauma, five or six blows to the head consistent with having been inflicted by a Maglite flashlight. She also suffered a stab wound just below the *38 neck and had defensive injuries. Several of her ribs were broken, possibly by someone stomping on her.
Patrick Vanorman lived in an apartment across the street from the mobile home park. He had known defendant for four years and had previously obtained pain pills from her. That mid-morning she came by and asked him to go across the street with her to get him some pain pills, and he agreed. They drove over in a Cadillac before noon. Defendant went into the mobile home and Vanorman stayed in the Cadillac. After about 10 or 15 minutes he left. While he had been waiting he heard screaming and arguing, including a man's voice saying, "get out" and "bitch" and defendant saying, "you owe [me] this bitch." When defendant looked outside Vanorman told her he was leaving. He also told her she could borrow $20 from him, and later ("a good hour, hour and a half") she returned to his apartment. She borrowed some clothes and was already wearing a different shirt.
Detective Brian Meux questioned defendant that evening while she was under arrest for car theft. She told him the Cadillac was at a stereo shop, but Meux knew it was actually at Vanorman's apartment complex. She claimed *921 another woman had been driving the car. She denied going into the Bains' mobile home. She claimed Melvin gave her money. She said he was her best friend, "like family," but showed no emotion when told he was dead. During the five-hour interview, she never claimed self-defense.
Defendant (aged 36) testified she had been living with Vaughn for about three years. She testified she had known Melvin for about three years. Eventually their relationship became sexual, and he would either pay her or buy her things. Jean did not know about the affair, so far as defendant knew. That morning defendant went to buy condoms. She denied threatening the clerk and claimed she just walked out with the goods. Vanorman had called her the night before about pain pills, which she had given him in the past. She thought she could get some from Melvin, who had given her pills before; she also wanted to have sex for money.
Defendant testified that after Melvin told her he could not get her the pills, she told Vanorman to leave. Because Jean was asleep, she and Melvin went into the family room to have sex. Jean appeared and began screaming and hitting Melvin. In the kitchen, Jean began hitting him with a flashlight; defendant intervened, grabbed the flashlight from her and gave it to Melvin. Jean again began fighting with Melvin, defendant heard screaming, and she again separated the couple; at that point she saw a knife in Jean's hand. As Jean swung the knife, defendant hit her in the head two or three times with the flashlight to defend herself. She did not remember pulling out the telephone cord. There was a lot of blood and she was scared, so she left. She thought Melvin was hurt and that she could be charged with something because she was covered with blood. She denied killing anybody or intending to kill anybody. She went to Vanorman's apartment to change her shirt. She only hit Jean in self-defense and she never touched the knife. She was scared because the Bains were White and she was Black and she thought the White officer questioning her (Detective Meux) would think she was guilty, so she lied to him.
On cross-examination she generally explained she had lied to the police so that she would not get into trouble. She admitted she did not tell Vaughn the Bains had been fighting and she had to defend herself, even though she considered Vaughn her boyfriend. She never told Meux anything about the Bains fighting. She did not *39 call for help for Melvin (who was bleeding), although he was someone she cared about, and she had told Meux he was her best buddy in the world.
Defendant admitted she was convicted of felony domestic violence, with Vaughn as the victim. She agreed that Vaughn testified they broke up in July 2013 when she attacked him but denied that this was so. She insisted she still lived with Vaughn.
*922 In rebuttal, an officer testified that based on blood spatter patterns, he believed Jean was sitting in a chair when she was attacked.
B. Closing Arguments
The People argued defendant at first only intended to get pills and money, but when Melvin refused to cooperate, she made a deliberate decision to kill him. A "blink of an eye" or "fraction of a second" was enough time; "A cold, calculated choice can be arrived at quickly. And that's exactly what happened in this case." Defendant was a liar. She first told Detective Meux she was not there (refuted by her DNA), then claimed self-defense (belied by the severity of the injuries, including defensive wounds ), then claimed the Bains killed each other (which made no sense). It made no sense that defendant had to hit Jean (a smaller and much older woman) multiple times with a flashlight to stop an attack, or that after being hit repeatedly by a flashlight Jean would continue the attack. It made no sense to claim that Melvin could have killed his wife when he was found beaten to death as well. Defendant claimed Melvin had been her good friend, but she displayed no remorse. Defendant had a prior conviction evidencing moral turpitude. The prosecutor referenced defendant's admission to lying and the instruction allowing the jury to "consider that" in determining guilt and then listed many of the lies defendant testified she had told Meux.
Defense counsel argued Vanorman offered defendant money for pills that she thought she could get from Melvin. Vanorman was just outside the trailer while defendant was inside. Melvin did not die instantly, and Jean did not die in the trailer but lived for a while after the attack, "so there's a lot of stuff [Jean] could have done after somebody leaves the house." Merely beating someone does not show premeditation. Defendant lied because she was a Black prostitute being interrogated by a White detective, after she had been in a house with two "at least wounded" White people, so her fear was natural.
In rebuttal, the prosecutor invited the jury to consider what defendant did before, during and after the killings. Before the killings defendant chose a heavy Maglite because she wanted to kill the elderly and vulnerable victims after she had quickly made her "cold, calculated decision." During the killings defendant repeatedly attacked vital regions of each victim's body (head and neck). Defendant attacked Jean (who was sitting in a chair) to eliminate a witness. After the killings, defendant hid the Cadillac and lied many times.
The jury took only 80 minutes to return verdicts of guilt.
*923 DISCUSSION
I-II**
III
CALCRIM No. 362
The parties agreed on all instructions, and in part the trial court gave the jury the pattern instruction on false statements, CALCRIM No. 362, as follows:
*40 "If the defendant made a false or misleading statement before this trial relating to the charged crime , knowing the statement was false or intending to mislead, that conduct may show she was aware of her guilt of the crime and you may consider it in determining her guilt.
"If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself." (Italics added.)
Based on the italicized references to "the crime" and "the charged crime," defendant contends this instruction improperly undermines any claim that defendant may have felt a consciousness of guilt of a lesser offense than first degree murder and therefore created a presumption of guilt of the charged crimes. She notes in contrast that the analogous CALJIC instruction provided that deliberately false statements could be used "to prove a consciousness of guilt" ( CALJIC No. 2.03 ) which avoids the problem by not restricting the awareness of guilt to "charged" offenses.
"Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under People v. Watson (1956) 46 Cal.2d 818, 299 P.2d 243." ( People v. Anderson (2007) 152 Cal.App.4th 919, 927, 61 Cal.Rptr.3d 903.)
Defendant's argument makes sense academically, but only if one focuses on certain words in this instruction and on this instruction itself rather than the whole body of instructions. In theory, as defendant points out, there is a *924 distinction between generalized consciousness of wrongdoing and consciousness of guilt of the specific crimes charged. But we are not persuaded that a jury would interpret CALCRIM No. 362 to preclude an appropriate defense argument about consciousness of guilt.
First, we must explain CALJIC No. 2.03 : " CALCRIM No. 362 is the successor to CALJIC No. 2.03, which provided as follows: 'If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crime or crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide.' " ( People v. McGowan (2008) 160 Cal.App.4th 1099, 1103, 74 Cal.Rptr.3d 57.) We have held that the differences between the two instructions are "minor." ( Id . at p. 1104, 74 Cal.Rptr.3d 57.)
In People v. Crandell (1988) 46 Cal.3d 833, 251 Cal.Rptr. 227, 760 P.2d 423 ( Crandell ), our Supreme Court considered a claim that CALJIC No. 2.03 allowed a jury to treat "consciousness of guilt" as tantamount to a confession. In rejecting this claim Crandell stated:
"Defendant's fear that the jury might have confused the psychological and legal meanings of 'guilt' is unwarranted. A reasonable juror would understand 'consciousness of guilt' to mean 'consciousness of some wrongdoing' rather than 'consciousness of having committed the specific offense charged.' The instructions advise the jury to determine what significance, if any, should be given to evidence of consciousness of guilt, and caution that such evidence is not sufficient to establish guilt, thereby clearly implying that the evidence is not the equivalent of a confession and is to be evaluated with reason and common *41 sense. The instructions do not address the defendant's mental state at the time of the offense and do not direct or compel the drawing of impermissible inferences in regard thereto." ( Crandell , supra , 46 Cal.3d at p. 871 [251 Cal.Rptr. 227, 760 P.2d 423].)
In a subsequent case our Supreme Court characterized this passage as holding a jury would understand the phrase "consciousness of guilt" "to mean only 'consciousness of some wrongdoing,' not consciousness of each and every element of the charged offense. [Citation.]" ( People v. Arias (1996) 13 Cal.4th 92, 142, 51 Cal.Rptr.2d 770, 913 P.2d 980.)
Defendant's view is that by so construing CALJIC No. 2.03, the Supreme Court avoided the very problem posed in this case, but by using different language without this protection CALCRIM No. 362 improperly guided the jury toward first degree murder.
We are not persuaded.
*925 We must consider the instructions together as a whole, to determine whether it is reasonably likely a jury would interpret an instruction in a particular way, because we presume jurors understand and correlate all of the instructions. (See People v. Cain (1995) 10 Cal.4th 1, 36, 40 Cal.Rptr.2d 481, 892 P.2d 1224 ; People v. Vang (2009) 171 Cal.App.4th 1120, 1129, 90 Cal.Rptr.3d 328.)
Here, the court instructed the jury it had to determine "what specific crime was committed" if any, and instructed the jury on second degree murder (including that the People had to prove first degree murder by showing premeditation, etc.), voluntary manslaughter (including that the People had to prove a lack of a sudden quarrel or provocation), and self-defense (including that the People had to prove defendant did not act in self-defense).
In considering all of the instructions given, the jury would understand that any consciousness of guilt evidenced by defendant's multiple lies to Detective Meux would operate as to any degree of homicide, not merely first degree murder. After all, "The inference of consciousness of guilt from willful falsehood or fabrication or suppression of evidence is one supported by common sense, which many jurors are likely to indulge even without an instruction." ( People v. Holloway (2004) 33 Cal.4th 96, 142, 14 Cal.Rptr.3d 212, 91 P.3d 164.) And at the time defendant was speaking to Meux, she could not have known what she later would or might be charged with. Few people understand the intricacies of California law pertaining to homicide (e.g., manslaughter vs. murder, second degree vs. first degree murder, justifiable homicide, etc.), and when a person feels some guilt about having done something wrong, fine points of law would not come into play.
Further, CALCRIM No. 362limits the reach of any adverse inference both by telling the jury that it decides the "meaning and importance" of the evidence and by telling the jury the making of a willfully false statement "cannot prove guilt by itself." ( CALCRIM No. 362.) CALCRIM No. 362, like CALJIC No. 2.03 before it, is designed to benefit the defense, " 'admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory.' [Citation.]" ( People v. Covarrubias (2016) 1 Cal.5th 838, 908, 207 Cal.Rptr.3d 228, 378 P.3d 615.) And because the evidence cannot prove guilt by itself, a jury would understand that the consciousness of guilt-however deep it ran-was not the equivalent of a confession. (See Crandell , supra , 46 Cal.3d at p. 871, 251 Cal.Rptr. 227, 760 P.2d 423.) Thus, a jury would understand both that false statements were not the *42 equivalent of a confession and that they were not themselves sufficient to prove guilt of the charged crimes. "The trial court properly left it for the jury to determine whether defendant's statement to police was false or deliberately misleading, and if so, what weight should be given to that evidence." ( People v. McGowan , supra , 160 Cal.App.4th at p. 1104, 74 Cal.Rptr.3d 57.) *926 Accordingly, we reject the claim that CALCRIM No. 362 as drafted is infirm.[2] If defendant wanted an instruction to clarify this point, "it was incumbent upon [her] to request it." ( Crandell , supra , 46 Cal.3d at pp. 870-871, 251 Cal.Rptr. 227, 760 P.2d 423.)
IV***
DISPOSITION
The judgment is affirmed.
We concur:
Blease, Acting P. J.
Butz, J.

This testimony is the basis for the first claim of error on appeal, which we address in Part I of the Discussion, post .

See footnote *, ante .

That does not mean the instruction could not be improved. Other CALCRIM instructions regarding consciousness of guilt speak of facts from which it may be inferred a defendant was "aware of (his/her) guilt" generally, without any possible suggestion that the inference is limited to guilt of the crime(s) charged, such as the instructions on suppression or fabrication of evidence (CALCRIM No. 371 ) and flight (CALCRIM No. 372 ) that were given to the jury in this case. Similarly, CALCRIM No. 362 could be amended to refer to consciousness of guilt without referencing the charged crime (as CALJIC No. 2.03 did and as CALCRIM Nos. 371 and 372 do) and avoid the issue.

See footnote *, ante .