Filed 7/6/21  P. v. Payne CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B302072 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA105936) |
| v. | |
| MANOLETTE CHRISTOPHER PAYNE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura L. Laesecke, Judge.  Affirmed.

Roberta Simon, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Manolette Christopher Payne appeals from a judgment entered after the jury convicted him of 11 counts of second degree robbery and three counts of attempted second degree robbery. The jury also found true the allegations Payne used a deadly or dangerous weapon in the commission of the offenses. Payne's sole contention on appeal is that his due process rights were violated because the trial court instructed the jury with CALJIC No. 2.92 that an eyewitness's level of certainty may be considered when evaluating the reliability of the witness's identification. Following the Supreme Court's decision in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*), we requested supplemental briefing from the parties. We now affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Robberies[1]*

  1. *Robbery of Adan Corona (count 7)*

On the night of February 21, 2017 Payne entered a pizza restaurant in Long Beach where he placed an order. The manager, Adan Corona, rang up Payne's meal, and then Payne pulled out a gun, pointed it at Corona, and told Corona to give him the money in the cash register. Corona gave Payne about $400, and Payne left. A surveillance video showing the incident was played for the jury. On February 27 Corona identified Payne

---

[1] The facts are taken from the evidence presented by the People at trial. Payne did not call any witnesses or present evidence.

2

in a six-pack photographic lineup (photographic lineup).[2]  Corona told Long Beach Detective Jacqueline Parkhill as to the lineup, "This guy for sure."  Corona also identified Payne at trial.

      2.    *Robbery of Shamsher Singh (counts 12 & 13)*

Early on the morning of February 11, 2017 Payne entered a convenience store in Carson.  He approached the cash register and asked the cashier, Shamsher Singh, for change for a dollar. When Singh opened the cash register, Payne pulled out a gun covered with a handkerchief and demanded Singh give him the cash in the register.  Singh was frightened and complied. Alexander Cruz was also working as a cashier in the store and saw Payne as he entered.  Cruz recognized Payne as a regular customer who came into the store two or three times every two weeks.

Payne returned to the same convenience store shortly after midnight on February 23 and again pulled out a gun.  He said to Singh, "Motherfucker, open the register."  Singh was scared and gave Payne about $300.  Payne then asked for cigarettes, which Singh gave him, and Payne left.  Surveillance videos from the store showing the two robberies were played for the jury.  On February 28 Singh identified Payne in the photographic lineup as the man who robbed him.  Singh and Cruz both identified Payne at trial.

---

[2]    It is undisputed that the witnesses to each of the robberies were shown the same six-pack photographic lineup in which Payne appears in photograph number 2.

### 3. *Robbery of Efrain Pacheco Antonio (count 1)*

On the night of February 18, 2017 Payne walked into a convenience store in Long Beach. He asked the cashier, Efrain Pacheco Antonio, to provide change for a dollar bill. When Antonio opened the cash register, Payne pulled out a gun wrapped in a handkerchief, pointed it at Antonio's stomach, and demanded Antonio give him money from the cash register. Antonio gave Payne between $600 and $900. A surveillance video captured the incident, and at trial Antonio identified Payne in the video. On February 27 Antonio identified Payne in the photographic lineup. Antonio also identified Payne at trial.

### 4. *Robbery of Cesar Nieto (count 2)*

On the morning of February 19, 2017 Payne ordered a drink at a fast food restaurant in Long Beach. Payne handed money to the cashier, Cesar Nieto, and Nieto opened the cash register. Payne then pulled out a gun and demanded Nieto give him the money. Nieto gave Payne $87 from the register. Two surveillance videos depicting the incident were played for the jury. On February 27 Detective Parkhill showed Nieto the photographic lineup, but Nieto was unable to identify the robber. Nieto stated, "I'm not sure I can identify."

Perla Morales was working in the back of the restaurant at the time of the incident. On February 28 Detective Parkhill showed Morales the photographic lineup. Morales did not hesitate in circling Payne's photograph. Morales stated to Detective Parkhill, "I remember he looked like that from the quick look that I got." However, at trial she acknowledged she was not sure which of two Black male customers at the restaurant was the robber.

4

5.    *Robbery of Kivan Madrigal (count 3)*

On the evening of February 19, 2017 Payne entered a fast food restaurant in Long Beach and asked an employee, Kivan Madrigal, to provide him with change for a dollar. When Madrigal opened the cash register, Payne pulled out a gun wrapped in a blue bandana and told Madrigal to "empty the register." Madrigal gave Payne all the cash in the register (around $100), and Payne left. Two surveillance videos showing the incident were played for the jury. On February 27 Detective Parkhill showed Madrigal the photographic lineup, and Madrigal identified Payne as the robber. Madrigal stated to Detective Parkhill, "He has the same facial features" and Payne's photograph "looked exactly like the guy." Madrigal also identified Payne at trial as the robber.

6.    *Robbery of Muhammad Ellahi (count 4)*

On the evening of February 20, 2017 Payne walked into an ice cream shop in Gardena and asked an employee, Muhammad Ellahi, for change for a dollar. Ellahi retrieved the change, and Payne pulled out a black bag with a pistol protruding, covered by a blue bandana. Payne said to Ellahi, "Put everything in the bag." Ellahi placed about $460 in the bag, and Payne left. Two surveillance videos showing the incident were played for the jury.

On February 27 Ellahi was shown the photograph lineup with Payne's photograph, and he was unable to identify Payne. Ellahi could not decide between two photographs. However, Ellahi identified Payne as the robber shown in the surveillance video at trial. When asked on cross-examination how he was able to recognize Payne when he previously could not, Ellahi responded that he was confused at the time he was shown the

photographic lineup, but he recognized Payne at the preliminary hearing. He added at trial, "I know it was him."

7. *Attempted robbery of Matthew Fernandez and Dolly Yonn (counts 5 & 6)*

Later on the night of February 20, 2017 Payne entered a fast food restaurant in Long Beach and requested employee Matthew Fernandez provide him change. As Fernandez opened the cash register, Payne said, "While you're there, give me the money in the register." Payne then pulled out a gun wrapped in a bandana, and Fernandez became scared. Fernandez's coworker Dolly Yonn was five to seven feet away at the time. Fernandez told Yonn to run to the back, and the two locked themselves in the bathroom. Two surveillance videos showing the incident were played for the jury. On February 27 Long Beach Detective Donald Collier showed Fernandez the photographic lineup; Fernandez was not able to identify the robber. Fernandez told Detective Collier it was "between no. 2 and no. 5. I feel it's closer to no. 5."

On February 27 Detective Collier also showed Yonn the six-pack photographic lineup. She identified Payne as the robber and stated, "A man came in and proceeded to try to rob us at gunpoint." According to Detective Collier, Yonn did not hesitate before identifying Payne. Yonn also identified Payne at trial as the robber. She testified, "I remembered his face when I was working that night."

8. *Robbery of Aruna Liyanage (count 8)*

On the night of February 23, 2017 Payne entered a convenience store and walked to the counter with $5 to pay for a beer. Employee Aruna Liyanage opened the cash register, and

6

Payne screamed, "I need money.  Don't close the register."  Payne also said he needed three boxes of cigarettes.  Payne pointed a gun at Liyanage, and Liyanage gave Payne almost $200 and three boxes of cigarettes.  Surveillance videos portraying the incident were played for the jury.  Liyanage was unable to identify the robber in the photographic lineup.

Luis Hernandez was washing dishes in the back of the store at the time of the robbery.  He made eye contact with the robber then saw Liyanage "put his hand up kind of a little bit and step[] back . . . ."  Hernandez did not learn Liyanage had been robbed until later.  Hernandez was not able to provide a description of the man to the police.[3]

9.    *Robbery of Elizabeth Contreras[4] (count 9)*

On the evening of February 25, 2017 Payne entered a clothing store in Long Beach.  As he entered, the manager, Lo Ann Hong, greeted him and saw his face.  Payne placed a gun on the counter, then pointed it at employee Elizabeth Contreras.  Payne told Contreras to take cash out of the register, and she gave him about $300.  Contreras focused on the gun during the incident.  Surveillance videos of the incident were played for the jury.  On February 27, 2017 Detective Parkhill showed Contreras

---

[3]    Although neither Liyanage nor Hernandez identified Payne as the robber, Payne does not argue that substantial evidence does not support the verdict on count 8.  Further, our review of the surveillance video of the robbery clearly shows the face of the robber.

[4]    Contreras was listed in the information and verdict forms as Contreras-Lopez, but she identified herself on the witness stand as Elizabeth Contreras.

the photographic lineup; she identified Payne as the robber. When asked on cross-examination how she could remember Payne's face given that she was looking at his gun, she responded, "I have a good memory. I remember somebody's face." On February 27 Hong also identified Payne as the robber in the photographic lineup. Hong stated as to Payne, "That's him. . . . I know it's not any of the others. For sure." Both Contreras and Hong identified Payne at trial.

10. *Attempted Robbery of Rosaura Perez (count 10)*

On the morning of February 27, 2017 Payne entered a fast food restaurant in Long Beach. He passed by a customer seated at a table, Nicholas Mansfield, and Payne said, "What up, boss?" Payne ordered food, then asked cashier Rosaura Perez for change for a $10 bill. When Perez opened the cash register, Payne said, "Give me the money," and he pointed a gun at her. Mansfield saw Payne point the gun at Perez, so he got up and stood behind Payne. Payne then told Perez, "Never mind," and he asked for his money back and left. Mansfield followed Payne out to the parking lot.

About two days later Mansfield identified Payne in the photographic lineup as the robber. Mansfield did not hesitate in making the identification. Mansfield also identified Payne at trial as the robber. Perez was shown the photographic lineup, but she was unable to identify the robber. She told the detective she believed the robber looked like the person in photograph number 5.

11. *Robbery of Pedro Lugo (count 14)*

On the evening of February 26, 2017 Payne entered a fast food restaurant in Carson. He asked the cashier, Pedro Lugo, for

8

change for a dollar for the bus. When Lugo returned with the change, Payne pointed a gun at him and demanded he go back and bring the rest of the cash in the register. Lugo gave Payne about $150 from the cash register. Payne then left in a black two-door Mercedes. Surveillance videos played for the jury depicted the incident. Two days later Lugo identified Payne as the robber in the photographic lineup. Lugo identified Payne immediately, stating, "I recognize [the] mustache and face." Lugo also identified Payne at trial.

12. *Robbery of Jasdeep Bhabgal (count 11)*

Later in the morning of February 27, 2017 Payne entered a convenience store in Long Beach. He gave the cashier, Jasdeep Bhabgal, $10 to pay for some items. When Bhabgal opened the cash register, Payne pulled out a gun and demanded Bhabgal give him all the money in the register. Bhabgal complied. Surveillance videos showing the incident were played for the jury.

Bhabgal looked out the window and saw Payne get in a black Mercedes soft-top convertible. Bhabgal was able to obtain a partial license plate number, which he gave to the police. His uncle Bhag Singh was also in the store and looked out the window as Payne left. The uncle was able to obtain the rest of the license plate number. Bhabgal gave the full license plate number to the police. The police matched the license plate number to a Mercedes registered to Payne. The next day Bhabgal identified Payne as the robber in the photographic lineup. He stated to the detective, "2 for sure. Without a doubt no. 2." He also identified Payne at trial as the robber.

9

### 13. *The arrest of Payne*

On February 27, 2017 police officers located Payne's car parked at a motel. The officers observed Payne leave the motel and walk toward the Mercedes, where he was detained. Police officers recovered $217 from Payne's front pants pocket. Police later searched Payne's car and recovered a jacket with a BB gun and several bandanas, among other items.

## B. *The Verdict and Sentence*

The jury found Payne guilty of the second degree robbery (Pen. Code, § 211)[5] of Antonio (count 1), Nieto (count 2), Madrigal (count 3), Ellahi (count 4), Corona (count 7), Liyanage (count 8), Contreras (count 9), Bhabgal (count 11), Singh (counts 12 & 13), and Lugo (count 14). The jury also found Payne guilty of the attempted second degree robbery (§§ 211, 664) of Fernandez (count 5), Yonn (count 6), and Perez (count 10). The jury found true as to each count the allegation Payne personally used a deadly or dangerous weapon, a BB gun (§ 12022, subd. (b)(1)).

In a bifurcated trial the trial court found true the special allegations Payne was convicted of two prior serious or violent felonies under the three strikes law (§§ 667, subds. (b)-(j), 1170.12), both of which were serious felonies within the meaning of section 667, subdivision (a)(1), and he suffered two convictions for which he served separate prison terms within the meaning of section 667.5, subdivision (b). The trial court sentenced Payne to an aggregate term of 468 years to life in state prison.

Payne timely appealed.

---

5        All further statutory references are to the Penal Code.

## DISCUSSION

Payne contends the trial court violated his due process rights in instructing the jury with CALJIC No. 2.92, which advised the jury that in evaluating an eyewitness identification, the jurors should consider "[t]he extent to which the witness is either certain or uncertain of the identification."[6] Payne argues

---

[6] The trial court instructed the jury with CALJIC No. 2.92, as modified: "Eyewitness testimony has been received in this trial for the purpose of identifying the defendant as the perpetrator of the crimes charged. In determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness's identification of the defendant, including, but not limited to any of the following: [¶] The opportunity of the witness to observe the alleged criminal act and the perpetrator of the act; [¶] The stress, if any, to which the witness was subjected at the time of the observation; [¶] The witness's ability following the observation to provide a description of the perpetrator of the act; [¶] The extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness; [¶] The cross-racial or ethnic nature of the identification; [¶] The witness's capacity to make an identification; [¶] Evidence relating to the witness's ability to identify other alleged perpetrators of the criminal act; [¶] Whether the witness was able to identify the alleged perpetrator in a photographic or physical lineup; [¶] The period of time between the alleged criminal act and the witness's identification; [¶] Whether the witness had prior contacts with the alleged perpetrator; [¶] The extent to which the witness is either certain or uncertain of the identification; [¶] Whether the witness's identification is, in fact, the product of his or her own recollection; and [¶] Any other evidence related to the witness's ability to make an identification."

this instruction on witness certainty was erroneous given scientific research showing that witness certainty has no correlation with the accuracy of the identification."[7] Considering the trial record as a whole, the trial court's instruction on

---

[7] The People contend Payne forfeited his claim of instructional error because his attorney did not object to the trial court's instruction with CALJIC No. 2.92. We generally review any claim of instructional error that affects a defendant's substantial rights whether or not trial counsel objected. (§ 1259 ["The appellate court may also review any instruction given . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."]; *People v. Burton* (2018) 29 Cal.App.5th 917, 923 ["'Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights.'"]; *People v. Bedolla* (2018) 28 Cal.App.5th 535, 544 [same].) Of course, "[w]e can only determine if [a] defendant['s] substantial rights were affected by deciding whether the instruction was given in error and, if so, whether the error was prejudicial." (*People v. Medina* (2019) 33 Cal.App.5th 146, 154, fn. 7.) That is, if Payne's claim has merit, it has not been forfeited. The People are correct that the Supreme Court in *People v. Sánchez* (2016) 63 Cal.4th 411, 461-462 found the defendant had forfeited his challenge to the trial court's failure to modify CALCRIM No. 2.92 by not requesting a modification. However, in light of the Supreme Court's decision in *Lemcke* raising potential constitutional issues with the eyewitness identification instruction (depending on the record), we review the merits of Payne's contention the instruction violated his constitutional rights on the record before us. Because we decline to find forfeiture, we do not reach Payne's argument his attorney's failure to object constituted ineffective assistance of counsel.

eyewitness identification did not violate Payne's due process rights.

A.  *The Supreme Court's Decision in* Lemcke

The Supreme Court in *Lemcke, supra*, 11 Cal.5th 644 rejected a due process challenge to CALCRIM No. 315, the successor instruction to CALJIC No. 2.92,[8] holding that "[w]hen considered in the context of the trial record as a whole, listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating identification testimony did not render [the defendant's] trial fundamentally unfair."  However, the Supreme Court observed that "[c]ontrary to widespread lay belief, there is now near unanimity in the empirical research that 'eyewitness confidence is generally an unreliable indicator of accuracy.'" (*Id*. at p. 647.)  The court explained, "As currently worded, CALCRIM No. 315 does nothing to disabuse jurors of that common misconception, but rather tends to reinforce it by implying that an identification is more likely to be reliable when the witness has expressed certainty.  This is especially problematic because many studies have also shown eyewitness confidence is the single most influential factor in juror determinations regarding the accuracy of an identification." (*Ibid*.)  The court referred consideration of the instruction to the Judicial Council and its Advisory Committee on Criminal Jury Instructions "to evaluate whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy." (*Ibid*.)  The court also directed

---

[8]  Although CALJIC No. 2.92 and CALCRIM No. 315 differ slightly, Payne does not contend the minor differences are material to his argument.

13

that until the Judicial Council completes its review, "trial courts should omit the certainty factor from CALCRIM No. 315 unless the defendant requests otherwise." (*Id*. at p. 648.)

In *Lemcke*, Desirae Lemcke and a Black male accomplice (Charles Rudd) were charged with the robbery of Monica Campusano. Campusano was walking down the hallway of a motel when she encountered a woman standing outside a motel room and a man standing just inside the doorway. The woman asked to use Campusano's cell phone, and as Campusano began to retrieve her phone, the man struck Campusano in the face and pulled her into the room. The man punched and kicked Campusano repeatedly, causing her to lose consciousness. When she regained consciousness, Campusano was alone in the room, and her purse and phone were gone. (*Lemcke, supra*, 11 Cal.5th at p. 648.) The responding police officer learned that the motel room was registered to Lemcke, who matched the description Campusano provided to a police officer at the scene. (*Ibid*.) The police officer also learned that Lemcke had previously obtained a no-contact order against Rudd, who matched Campusano's description of the man. (*Ibid*.) The officer created a six-pack photograph lineup with a photograph of Rudd and showed it to Campusano, who was "'under anesthesia'" at the hospital. (*Ibid*.) Campusano pointed to Rudd's photograph and "stated that she recognized his nose, mouth and jaw area." She signed her name by the photograph but spelled it incorrectly. (*Id*. at p. 649.)

Approximately three months later Campusano was shown a photographic lineup including a photograph of Lemcke, and Campusano selected Lemcke's photograph as the woman in the motel. Campusano also noted that the male assailant had a tattoo on his neck. (*Lemcke, supra*, 11 Cal.5th at p. 649.) A detective prepared a photographic lineup with Rudd's tattoo and

14

the tattoo of Lemcke's current boyfriend, without showing the men's faces. Six days later Campusano selected the photograph of Rudd's tattoo from the photographic lineup, explaining that it looked like the one she remembered. (*Ibid.*) She also identified the photograph of Rudd as the one the first officer had shown her at the hospital. (*Ibid.*) The detective showed Campusano a second six-pack photographic lineup that did not include Rudd. Campusano stated she did not recognize anyone in the photographic lineup and, pointing back to Rudd's photograph, "'for sure it was [him].'" (*Ibid.*)

Campusano identified Rudd at trial, stating, "'I remember his face, his tattoo and his look, like he was looking with anger.'" (*Lemcke, supra*, 11 Cal.5th at p. 650.) The defense called an eyewitness identification expert, who opined as to witness certainty that "current research suggested that 'confidence' can be 'useful' when there has been a 'fair lineup soon after the event.' However, 'once outside that window and you go forward, that moment in time when [the witness] made an [identification], once you get past that, confidence is not related to accuracy in any regard.'" (*Id*. at p. 651.) The trial court denied Rudd's request to strike the certainty factor from CALCRIM No. 315 in instructing the jury. (*Id*. at p. 652.) The prosecutor in closing argument directed the jury to CALCRIM No. 315 and noted that Campusano "'was certain the entire time.'" (*Ibid.*)

Reviewing the instruction in the context of the instructions as a whole and the trial record, the Supreme Court concluded Rudd's trial was not ""'so infuse[d] . . . with unfairness as to deny due process of law.'"" (*Lemcke, supra*, 11 Cal.5th at p. 655.) The Supreme Court rejected Rudd's contention that CALCRIM No. 315 lowered the prosecutor's burden of proof, citing the finding in its prior opinion in *People v. Sánchez, supra*, 63 Cal.4th 411, 461-

15

463 (approving CALJIC No. 2.92) that "the instruction does not direct the jury that "'certainty equals accuracy.'" (*Lemcke*, at p. 647.) The court observed that "the wording of the instruction might cause some jurors to infer that certainty is generally correlative of accuracy," but it noted Rudd was allowed to present expert witness testimony to rebut that inference, and the expert opined that "the only time certainty may be useful in assessing accuracy is when the identification is made in close temporal proximity to the event and law enforcement has utilized nonsuggestive procedures." (*Id.* at pp. 657-658.)

The Supreme Court also noted that the jury was instructed with CALCRIM No. 332 as to expert opinions that it "'*must* consider th[ose] opinions.'" (*Lemcke, supra*, 11 Cal.5th at p. 658.) Further, the jury was instructed as to witness testimony that "'[p]eople sometimes honestly . . . make mistakes about what they remember'" and that the jurors were responsible for "'judg[ing] the credibility or believability of the witnesses.'" (*Id.* at p. 658.) In addition, the jury was instructed that the prosecution had the burden of proving all elements of the crime, which the instruction on eyewitness identity reiterated, stating, "'The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty.'" (*Ibid.*)

The Supreme Court also rejected Rudd's argument that the certainty instruction violated his due process rights by denying him a meaningful opportunity to present a complete defense, pointing both to the expert testimony and defense counsel's cross-examination of the investigating officers that revealed problems with Campusano's identification, including that her first identification was while she was under anesthesia in the hospital

16

and the second identification used the same photograph.
(*Lemcke, supra*, 11 Cal.5th at p. 660.)

B.     *The Trial Court's Inclusion of the Certainty Factor Did Not
       Violate Payne's Constitutional Rights*

Payne seeks to distinguish *Lemcke* on the basis that Payne
did not present an eyewitness identification expert.  However,
Payne had an opportunity to present expert testimony but opted
not to do so.  (*Lemcke, supra*, 11 Cal.5th at p. 658 ["Rudd was
permitted to present expert witness testimony to combat that
inference."].)[9]

Payne also argues that witnesses in 13 of the 14 incidents
(all the robberies except that of Ellahi) identified Payne in the
photographic lineup as the robber, whereas in *Lemcke* only a
single victim identified Rudd.  Payne draws a false distinction
because this is not a case where 14 witnesses testified about one
incident.  Rather, as in *Lemcke*, one or at most two witnesses
testified as to a single incident.  Many of the victims in this case
were either not certain about their identifications or could not
identify Payne.

As defense counsel emphasized in her closing argument,
Ellahi (count 4), Fernandez (count 5), Liyanage (count 8), and
Perez (count 10) could not identify Payne in the photographic
lineup.  Fernandez instead stated he believed the robber was the
individual in position 5 in the photographic lineup.  Yonn, who
was present with Fernandez and identified Payne as the robber,
was farther away from the robber and only learned there was a

---

[9]     Payne does not argue the failure of trial counsel to call an
eyewitness identification expert was ineffective assistance of
counsel.

17

robbery in progress when Fernandez yelled for her to run. Hernandez was present, but he was at the back of the restaurant washing dishes at the time of the robbery and did not identify Payne. Perez, like Fernandez, believed the robber was the person in photograph number 5. Mansfield identified Payne as the man who robbed Perez, but defense counsel noted that Mansfield only saw the robber from his position behind the robber, then Mansfield followed the robber out of the restaurant. Likewise, Nieto (count 2) was unable to identify Payne in the photographic lineup. Although Morales was able to identify Payne as the person who robbed Nieto, she was not able to identify Payne at the preliminary hearing.

Defense counsel in her closing argument also emphasized the other factors that made the identifications unreliable, including that Antonio (count 1), Madrigal (count 3), Contreras (count 9), and Bhabgal (count 11) were all scared and under stress during the robberies (the second factor in CALJIC No. 2.92) and focused on the robber's gun instead of his face. As to the robbery of Contreras, the second witness (Hong) was similarly stressed and "panicked." As to count 7, defense counsel noted that Corona was very focused on whether the robber was using a BB gun or a real gun, distracting his attention. Singh (counts 12 and 13) was likewise scared during the robberies. And as to Lugo (count 14), he went back and forth to the register, and defense counsel argued Lugo was therefore not facing the robber during much of the incident. Thus, Payne had the opportunity to present a complete defense on the issue of identity.

In addition, unlike in *Lemcke* where the principal evidence against Rudd was the witness's identification, here the jury viewed surveillance video of 13 of the incidents (all but the robbery of Perez). The prosecutor in his closing argument heavily

18

relied on the surveillance videos, replaying the videos as to each robbery.[10]

Further, the court gave appropriate instructions on witness testimony (as in *Lemcke*), including CALJIC No. 2.21.1 that "[f]ailure of recollection is common" and "[i]nnocent misrecollection is not uncommon." The court also instructed the jury with CALJIC No. 2.81 that "[i]n determining the weight to be given to an opinion expressed by any witness, you should consider his or her believability, the extent of his or her opportunity to perceive the matter upon which his or her opinion is based and the reasons, if any, given for it. You are not required to accept an opinion but should give it the weight, if any, to which you find it entitled." The court also properly instructed the jury, as in *Lemcke*, with CALJIC No. 2.90 that the People must prove a defendant's guilt beyond a reasonable doubt and CALJIC No. 2.91 that "[i]f, after considering the circumstances of the identification and any other evidence in this case, you have a reasonable doubt whether defendant was the person who committed the crime, you must give the defendant the benefit of that doubt and find him not guilty."

Under these circumstances, the trial court's inclusion of the certainty factor in the eyewitness identification instruction did not violate Payne's due process rights.

---

[10]    Although the prosecutor did not discuss witness certainty in his initial closing argument, he did argue this factor (among others) in his rebuttal argument, asserting that "[e]very witness you have heard up there who did identify was certain, except for the cashier, who wasn't sure which person she identified."

19

## DISPOSITION

The judgment is affirmed.

FEUER, J.

We concur:

PERLUSS, P. J.

SEGAL, J.