Filed 1/27/22  P. v. Leatherwood CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>JASON LEATHERWOOD,<br><br>　　　Defendant and Appellant. | A159498<br><br>(Sonoma County<br>Super. Ct. No. SCR-699215-1) |

Jason Leatherwood appeals after a jury convicted him of forcible rape (Pen. Code, § 261, subd. (a)(2)) and the trial court sentenced him to a six-year prison term.  Leatherwood asserts the trial court committed instructional error and that his trial counsel was constitutionally ineffective.  We affirm because he demonstrates no prejudicial error.

**BACKGROUND**

**A.**

Jane Doe and Leatherwood dated for about five years. They lived together—in Doe's home—for three of those years. Before meeting Leatherwood, Doe had been sexually assaulted, when she was a teenager.  She testified that she told Leatherwood about the assault and that she remained traumatized.

1

Doe and Leatherwood's relationship was unstable from the beginning. They frequently argued and sometimes their fights turned physical. Doe repeatedly asked Leatherwood to move out over the course of their relationship. But Leatherwood ignored her.

On one occasion, in March 2015, Leatherwood and Doe argued after attending a work party. Doe testified she complained to Leatherwood that he had not introduced her to anyone and he began "screaming." Doe said she became particularly scared when Leatherwood tried to open the passenger door while driving her home on the freeway. Once home, Doe slapped Leatherwood. He called the police and, although she attempted to explain that she slapped him because she felt both angry and threatened, she was arrested. No charges were filed.

After Doe's arrest, Leatherwood temporarily moved out. She let him move back in because he made her feel guilty and "crazy." Thereafter, he periodically threatened to call the police when she was emotional. Doe testified that, after her arrest, Leatherwood mostly slept in a guest bedroom. She continued to have sex with Leatherwood but on some occasions it was "[a]gainst [her] wishes." She described Leatherwood ignoring her statements that she did not want to be intimate with him and said she eventually gave in because she believed it was her "duty" to please him. The sex was "[r]ough" and "violent."

On August 10, 2016, Leatherwood returned from a vacation, and ignored Doe's renewed request to move out. That night, Doe went to sleep alone in her locked bedroom. Leatherwood broke in, ignored her demands that he leave, and got in bed (naked) with her. She fled, driving to Leatherwood's father's home—who she asked to help remove Leatherwood from her home. Leatherwood remained in the house but the two did not talk for a few days.

2

On August 14, 2016, Doe drove to a picnic. Although he had not been invited, Leatherwood followed her there. Doe testified that she drank no more than a glass of wine at the picnic and that Leatherwood drove them both home because she was tired.

At home, Doe changed into a bathrobe and the two sat on the couch—eating pizza and drinking wine. Doe decided to go to bed after having only a couple sips of wine. She testified that Leatherwood followed her, grabbed her by the shoulders, pushed her into her room, tossed her onto the bed, and ignored Doe's demand to "leave [her] alone."

Leatherwood was naked. He got on top of Doe, grabbed her wrists and hair, and then held her wrists over her head. He said, "he had enough time invested with [Doe] and that it was time to get rid of [her]." While restraining her hands and laying on top of her, Leatherwood opened Doe's robe and touched her vagina. At the same time, he yelled that he wanted to know how she was raped and "if that's how [she] like[s] having sex." Doe repeatedly told him to stop and struggled (unsuccessfully) to free herself.

Continuing to use his body weight to hold Doe down,[1] Leatherwood retrieved a dildo from the night stand, and pushed it into her anus. Doe told him that "it hurt" and to "get it out." He also used a vibrator on her clitoris. Doe testified that the vibrator was not plugged into the wall. She eventually managed to free one hand and removed both devices. Leatherwood then began having intercourse with her. He continued to yell and accused her of having sex with her brother. At this point, Doe lost the strength to fight and simply waited until he ejaculated.

---

[1] Leatherwood was six feet, two inches tall and weighed about 220 pounds. Doe was about five feet, six inches tall and weighed approximately 160 pounds.

3

Doe testified that, before being raped on August 14, she last had sexual intercourse with Leatherwood in May 2016.

**B.**

The following day, Doe went to the Petaluma Police Department. Doe reported being raped by her boyfriend on August 14 and that she had also been sexually assaulted by him before then. However, she told the investigating detective that, with the exception of the sex assaults and the March 2015 incident, they had no further history of domestic violence.

The initial statement Doe gave to police was inconsistent with her testimony at trial in some additional ways. She told the detective that July 2016 was the last time she and Leatherwood had consensual sex. She also reported drinking four large glasses of wine at the picnic and that she asked Leatherwood to drive home because she was intoxicated. She also said that she stopped the vibrator Leatherwood used by unplugging it from an electrical outlet. Doe attributed these inconsistencies to the difficulty she experienced in talking about the assault.

Doe made two pretext calls with the detective. Leatherwood did not make any admissions and denied having sex with her the night before. He said that she had been drunk and "pass[ed] out."

Doe also went to the hospital where she underwent a forensic rape exam. The examiner found four bruises inside Doe's vagina, two near her clitoris, and one in her rectum. The examiner, who was deemed an expert on interpreting such physical findings, testified that the bruises were consistent with Doe's account and could have been caused by blunt force trauma. They were also consistent with consensual sex. Doe's bruises were to mucosal tissue, which typically heal "within a couple of days" and are unlikely to be found after 72 hours.

4

Doe's examiner took a vaginal swab that showed the presence of male DNA. When that male DNA profile was compared to a known sample from Leatherwood, it was determined that he was the source of the DNA found in Doe's vagina. According to the testifying criminalist, intercourse likely occurred no later than three days before the sample was obtained.

## C.

Leatherwood's ex-girlfriend and the mother of his children testified (pursuant to Evidence Code sections 1108 and 1109) that, towards the end of their relationship, Leatherwood forced her to have sex, against her will, approximately three to five times.[2] In the first instance, after she declined sex for a couple of days, she woke up to find Leatherwood on top of her, pinning her arms down, calling her names, and inserting his penis in her vagina. He ignored her demands to stop, which is how she became pregnant with their second child.

Leatherwood's ex-girlfriend told him to leave in June 2009. On that occasion, one of their daughters had been sleeping between them. Leatherwood reached over their daughter to touch his ex-girlfriend, but she pushed him away and rolled over. When she felt movement behind her back and turned around, she saw Leatherwood taking his hand away from touching their daughter. Her trial testimony was the first time she mentioned her belief that Leatherwood had inappropriately touched their child to anyone. Although Leatherwood's ex-girlfriend obtained a lifetime restraining order against him during custody proceedings, she never mentioned any sexual assault.

Doe and Leatherwood's ex-girlfriend had met before—because Doe supervised Leatherwood's visits with his children on

[2] Undesignated statutory references are to the Evidence Code.

three occasions.  However, the two women never spoke about this case.

## D.

Leatherwood testified, in his own defense, that he and Doe had sex on August 13 but *not* on August 14.

On the latter date, Doe "passed out" on her bed after the picnic, where she became too intoxicated to drive.  When Leatherwood sat down on the bed, she woke up, called him names, and began striking him.  He grabbed her hands.  While he was still holding her wrists, she tried to knee him in the groin, pulled him down on top of her on the bed, yelled, and then passed out "cold."

The next day, Doe called him, asking odd questions.  After that, he went to stay at his father's house because he did not want "drama."

A few days later, Leatherwood spoke to the investigating detective.  During the recorded interrogation, Leatherwood gave an account largely consistent with his testimony at trial, except that he told the detective, at least eight times, that the last time he and Doe had sex was before his vacation in the first week of August.  At trial, Leatherwood explained this discrepancy was due to him not sleeping the night before the interview.  In rebuttal, the investigating detective testified that Leatherwood did not appear tired.  Nor did Leatherwood attempt to correct misstatements.

With respect to the events preceding Doe's March 2015 arrest, Leatherwood testified that she opened the passenger door of his work truck, three or four times.  He feared that someone would get hurt if "a very large ratchet wrench on the floor . . . on her side" fell out on the freeway.

Leatherwood denied hitting Doe.  He also denied ever sexually or physically assaulting his ex-girlfriend.  He moved out when his ex-girlfriend asked for an open relationship, which led to a long and contentious custody battle.

Several character witnesses testified that they do not know Leatherwood to be physically or emotionally abusive to women.

**E.**

The jury convicted Leatherwood of forcible rape but acquitted him on two additional counts of forcible sexual penetration by a foreign object (Pen. Code, § 289, subd. (a)(1)(A)).  He was sentenced to six years in prison.

**DISCUSSION**

**A.**

Leatherwood argues that his trial counsel provided ineffective assistance by failing to object to his ex-girlfriend's testimony—disclosed for the first time at trial—that suggested Leatherwood molested his daughter.  He contends the evidence was irrelevant and prejudicial and thus would not have survived a section 352 challenge.  We find no ineffective assistance or prejudice.

**1.**

Under both the United States and California Constitutions, a criminal defendant has the right to the effective assistance of counsel.  (*Strickland v. Washington* (1984) 466 U.S. 668, 684-686 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 215 (*Ledesma*).)  To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance was so deficient that it fell below an objective standard of reasonableness, under prevailing professional norms, and (2) the deficient performance was prejudicial, rendering the results of the trial unreliable or

7

fundamentally unfair. (*Strickland, supra*, at pp. 688, 692; *Ledesma, supra*, at pp. 216-217.)

"[W]e begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.' [Citation.] Accordingly, we have characterized defendant's burden as 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ' " 'no rational tactical purpose' " ' for an action or omission." (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) " ' "[[I]f] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citations.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

Generally, prejudice must also be affirmatively demonstrated. (*Ledesma, supra*, 43 Cal.3d at p. 217.) Prejudice is shown when there is a reasonable probability that, but for counsel's ineffective representation, the result of the proceeding would have been different. (*Strickland, supra,* 466 U.S. at p. 694.) A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*In re Hardy* (2007) 41 Cal.4th 977, 1018.)

## 2.

Failure to object to evidence of questionable admissibility may constitute inadequate assistance of counsel. (*Ledesma, supra,* 43 Cal.3d at p. 224.) However, " '[a]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel.' " (*People v. Avena* (1996) 13 Cal.4th 394, 421.)

8

The record before us does not directly disclose why Leatherwood's trial counsel did not object to his ex-girlfriend's testimony that he inappropriately touched (or attempted to touch) their daughter. We nonetheless agree with the People that Leatherwood's trial counsel could have made a reasonable tactical decision to decline to object. The evidence was not clearly inadmissible under sections 352 and 1108. (See § 352 ["court in its *discretion may* exclude evidence if its probative value is substantially outweighed" by likelihood of undue delay, undue prejudice, or confusion], italics added; *People v. Jones* (2012) 54 Cal.4th 1, 50 ["[a]dmissibility under . . . section 1108 does not require that the sex offenses be similar; it is enough the charged offense and the prior crimes are sex offenses as defined by the statute"].) And the challenged evidence reflected negatively on Leatherwood's ex-girlfriend's credibility.

In fact, on cross-examination, defense counsel elicited testimony from Leatherwood's ex-girlfriend that made clear that she had never before told anyone about the incident with her daughter. Defense counsel capitalized on that point, in closing argument, by telling the jury: "[The prosecutor] said on cross-examination that [Leatherwood's ex-girlfriend] accused [him] of making up stories as time went by. I almost don't want to get into this, but some of you may have heard of the term of phrase the pot calling the kettle black. [Leatherwood's ex-girlfriend] did the exact same thing. She never told the Judge anything about sexual assault. She actually told you for the first time here last week not only did [Leatherwood] sexually assault her, but the day that she kicked [him] out was the day where she thought [he] was touching his child inappropriately. . . . *That is so outside of the scope of what would be reasonable.* If you are trying to keep [Leatherwood] from having access to your children, don't you think the first thing you would ever tell the Judge is he tried to touch my child in a sexually inappropriate way? Why would you wait until the actual trial when you're looking at the whites of

9

the eyes of the twelve jurors that are going to determine his fate? Why do you wait? You don't. *You're lying*." (Italics added.)

Given the importance of his ex-girlfriend's testimony (as a whole) to the prosecution's case, Leatherwood's trial counsel may have reasonably decided that attacking her credibility was a better tactical move than objecting. Accordingly, Leatherwood fails to establish ineffective assistance of counsel on appeal.

**3.**

Furthermore, Leatherwood has not shown that any assumed ineffective assistance was prejudicial.

Leatherwood's ex-girlfriend's testimony that he inappropriately touched (or attempted to touch) his daughter was only one small part of the section 1108 evidence. Assuming the jury believed the balance of his ex-girlfriend's testimony, admission of which is not challenged on appeal, the jury was entitled to find that Leatherwood has a propensity to commit domestic violence and sex offenses. (See §§ 1108, subd. (a), 1109, subd. (a).) Indeed, the testimony was striking precisely because it was so similar to the rape at issue here: during a tumultuous relationship, Leatherwood forced his girlfriend to have sex against her will multiple times, including at least once when he pinned her arms down, verbally abused her, and ignored her demands to stop.

This was not simply a "he said-she said" case. In addition to evidence suggesting Leatherwood raped his prior girlfriend, Doe's testimony—that Leatherwood violently raped her on August 14—was corroborated by the DNA and other physical evidence, her prior statement to the investigating detective, and Leatherwood's inconsistent statements regarding when the two last had sexual intercourse. Unlike Leatherwood's inconsistent statements, the conflicts between Doe's testimony and her prior

statements to police all related to the counts on which Leatherwood was acquitted or tangential matters.

Given the strength of the case against him, it is not reasonably probable that the jury would have reached a more favorable result absent counsel's assumed ineffective assistance.

**B.**

Leatherwood also insists the evidence does not support the trial court's decision to instruct the jury with CALCRIM No. 361. We assume he is right, but conclude any error was harmless.

**1.**

The trial court instructed the jury: "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] . . . [I]f the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

**2.**

We review claims of instructional error de novo (*People v. Mitchell* (2019) 7 Cal.5th 561, 579), considering the instructions in context. (*People v. Burton* (2018) 29 Cal.App.5th 917, 924.) " 'It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference.' " (*People v. Saddler* (1979) 24 Cal.3d 671, 681 (*Saddler*).)

Our Supreme Court has instructed that CALCRIM No. 361 should be given only when a testifying defendant completely fails to explain or deny incriminating evidence or claims to lack

11

knowledge despite the evidence showing that defendant could reasonably be expected to have such knowledge. (*People v. Cortez* (2016) 63 Cal.4th 101, 117.) "The instruction acknowledges to the jury the 'reasonable inferences that may flow from *silence*' when the defendant 'fail[s] to explain or deny evidence against him' and 'the facts are peculiarly within his knowledge.' " (*Ibid.*)

**3.**

Even if we assume that Leatherwood is correct that no evidence supported the instruction, any error was harmless on this record.

Contrary to Leatherwood's assertions, error in giving the instruction does *not* implicate a defendant's constitutional rights and prejudice is shown only if it is reasonably probable that a more favorable result would have otherwise been reached. (*Saddler, supra*, 24 Cal.3d at pp. 679-681, 683; *People v. Grandberry* (2019) 35 Cal.App.5th 599, 610-611; *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1471-1472 (*Lamer*).)

As we explained above, the evidence supporting Leatherwood's guilt on the forcible rape count was strong. Additionally, the impact of CALCRIM No. 361 was mitigated by the language of the instruction itself, which does not direct the jury to draw adverse inferences against the defendant. In fact, CALCRIM No. 361 instructs that a failure to explain or deny, by itself, is not a sufficient basis upon which to infer guilt. The instruction also emphasizes the People's burden to prove guilt beyond a reasonable doubt and leaves the meaning and importance of the defendant's failure to explain or deny to the jury.

Any possible prejudice was further mitigated by CALCRIM No. 200, which instructed the jury that "[s]ome of these instructions may not apply, depending on your findings about the facts" and to "follow the instructions that do apply to the facts as

12

you find them." (See *Saddler, supra*, 24 Cal.3d at p. 684; *Lamer, supra*, 110 Cal.App.4th at p. 1472.) We presume the jury followed this instruction. (*People v. Fuiava* (2012) 53 Cal.4th 622, 669.)

It is not reasonably probable Leatherwood would have obtained a more favorable verdict had CALCRIM No. 361 not been given. (See *Lamer, supra,* 110 Cal.App.4th at p. 1472 ["courts have routinely found that the improper giving of [the precursor to CALCRIM No. 361] constitutes harmless error"].)

## C.

Finally, Leatherwood contends that the consciousness of guilt instruction (CALCRIM No. 362) violates due process by reducing the People's burden of proof and allowing the jury to draw irrational inferences. His claim lacks merit.

The trial court instructed the jury: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made a statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

Our Supreme Court has repeatedly upheld CALCRIM No. 362 (and its predecessor instruction) against identical challenges. (See, e.g., *People v. Howard* (2008) 42 Cal.4th 1000, 1024-1025; *People v. Holloway* (2004) 33 Cal.4th 96, 142.) "The inference of consciousness of guilt from willful falsehood or fabrication . . . is one supported by common sense, which many jurors are likely to indulge even without an instruction." (*Holloway, supra,* at p. 142.) The " 'cautionary nature' " of the instruction benefits the defense, by admonishing the jury to be cautious in considering

" 'evidence that might otherwise be considered decisively inculpatory.' " (*Ibid*.)

There is similarly no support for Leatherwood's position that, before the trial court may give CALCRIM No. 362, the inference a defendant lied must be conclusively established. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102 [rejecting same argument].) "[T]here need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference." (*Ibid*.) The record contains substantial evidence to support the inference Leatherwood lied to police about the date he and Doe last had sex. CALCRIM No. 362 "properly [leaves] it for the jury to determine whether [a prior] statement to police was false or deliberately misleading, and if so, what weight should be given to that evidence." (*People v. McGowan* (2008) 160 Cal.App.4th 1099, 1104.)

The trial court also gave CALCRIM No. 226, which instructed the jury that it may consider inconsistent statements in evaluating the credibility of any witness (including Doe). CALCRIM No. 362 is not an improper pinpoint instruction. (*People v. Kipp* (1998) 18 Cal.4th 349, 375; *People v. McGowan, supra,* 160 Cal.App.4th at pp. 1103-1104.)

## DISPOSITION

The judgment is affirmed.

14

                                     _____

                                     BURNS, J.

We concur:

_____

JACKSON, P.J.

_____

SIMONS, J.

A159498