Filed 2/10/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B299482 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA470834) |
| FROYLAN DELGADO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge. Affirmed in part; reversed in part; and remanded with instructions.

Julie Caleca, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Julie A. Harris, Shezad H. Thakor, and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Froylan Delgado appeals from a judgment entered after the jury convicted him of shooting at an occupied vehicle, assault with an assault weapon, and possession of a firearm by a felon. The jury also found true the gang and firearm enhancements. On appeal, Delgado contends his due process rights were violated because the trial court instructed the jury with CALCRIM No. 315 that an eyewitness's degree of certainty can be considered when evaluating the reliability of the witness's identification.[1]

We affirmed the judgment in *People v. Delgado* (Feb. 3, 2021, B299482) [nonpub. opn.], holding that instruction on an eyewitness's degree of certainty was not error under *People v. Sánchez* (2016) 63 Cal.4th 411, 462 (*Sánchez*). The Supreme Court granted review and on August 25, 2021 transferred the matter back to this court with directions to vacate our prior opinion and reconsider the appeal in light of *People v. Lemcke* (2021) 11 Cal.5th 664, 666 (*Lemcke*), in which the Supreme Court found that CALCRIM No. 315 has the potential to mislead jurors

---

[1] Delgado also argues the trial court abused its discretion by declining to exercise its discretion to strike the firearm enhancement under Penal Code section 12022.53, subdivision (c); defense counsel rendered ineffective assistance of counsel in failing to present any argument on Delgado's behalf at the sentencing hearing; and the trial court's imposition of court assessments and restitution fines violated Delgado's due process rights because the court did not conduct a hearing on his ability to pay. We do not reach these issues because we reverse the gang enhancements and remand for resentencing. Delgado will have an opportunity at the resentencing hearing to address the firearm enhancements and his ability to pay the fines and fees. All further undesignated statutory references are to the Penal Code.

by reinforcing a "common misconception . . . that an eyewitness identification is more likely to be reliable where the witness has expressed certainty." However, considering the jury instructions as a whole and the trial record, we conclude the inclusion of the witness-certainty factor did not violate Delgado's due process rights.

Following the Supreme Court's transfer to this court, the Legislature enacted Assembly Bill No. 333 (2021-2022 Reg. Sess.) (2021 Stats., ch. 699) (Assembly Bill 333), effective January 1, 2022, which made several modifications to the criminal street gang enhancement statute (§ 186.22), including modification of the definition of a "criminal street gang" in section 186.22, subdivision (f), to require proof that members of a gang "collectively engage in, or have engaged in, a pattern of criminal gang activity." We agree with Delgado that the requirement in amended section 186.22, subdivision (f), that gang members "collectively engage" in a pattern of criminal gang activity means the People were required to prove that two or more gang members committed each predicate offense, and here, there was insufficient evidence that multiple Avenues gang members committed the predicate offenses. We reject the People's contention that proof that individual gang members committed the predicate offenses on separate occasions is sufficient to show the gang members "collectively" engaged in a pattern of criminal activity.

Delgado's convictions of shooting at an occupied motor vehicle, possession of a semiautomatic firearm by a felon, and assault with an assault weapon, and the jury's true findings on the firearm enhancements are affirmed. We reverse the jury's true findings that Delgado committed the underlying offenses for the benefit of a criminal street gang, and we remand to give the

3

People an opportunity to retry the gang enhancement and to meet their burden of proof under Assembly Bill 333's new requirements. If the People elect not to try the gang enhancement, Delgado is to be resentenced.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Evidence at Trial*
    1.    *The shooting*

At approximately 1:20 a.m. on August 25, 2018 six Los Angeles Police Department (LAPD) officers responded to a 911 call of shots fired in the area of Drew and Weldon Streets in northeast Los Angeles, near 3405 Drew Street. The location was at the heart of the territory claimed by the Avenues street gang and the stronghold of the Drew Street clique within the Avenues gang.

Upon arriving at the scene, the police officers detained several known Avenues gang members. Gabriela Alonso, who was an associate of the gang, was detained with her boyfriend Juan Briseno, an Avenues gang member, as the two walked away from the area near 3411 Drew Street. Police officers also detained Avenues gang member Gonzalo Urieta, who was running down Drew Street away from the scene, and Avenues gang member Adrian DeJesus, who was holding his waistband while walking away from 3411 Drew Street.

During a canvass of the area, Officer Tom Quino found three spent .223 caliber shell casings in the walkway and street in front of 3405 Drew Street. Officer Michael Marino discovered a loaded semiautomatic firearm wrapped in a towel hidden behind the fence at 3411 Drew Street. Daniel Rubin, a criminalist with the LAPD firearm analysis unit, testified the

4

firearm had the characteristics of an assault weapon as defined under California law because it was capable of accepting a detachable magazine inserted into the firearm in a location other than the pistol grip, and its barrel was covered. Through laboratory testing, Rubin confirmed the recovered shell casings had been fired from the firearm. No fingerprints were recovered from the firearm.

On the morning of the shooting, Officer Marino and Sergeant Nick Giordano were able to obtain and view surveillance video from 3407 Drew Street. The video showed that on August 25, 2018 at 1:16 a.m. a man in a white sleeveless shirt emerged onto the sidewalk in front of 3405 Drew Street as a car was driving down the street. A flash emanated from the man's position as the car passed him. The man then moved into the street behind the car, and another flash appeared where the man was standing. The 3407 Drew Street video was played for the jury.[2]

The 3407 Drew Street video also showed a woman and a man (later identified as Alonso and Briseno) stashing a towel-wrapped object inside the fence at the location where Officer Marino had recovered the assault weapon. Based on the video, Alonso and Briseno were arrested. Briseno tested positive for gunshot residue; Alonso's gunshot residue test was negative.[3]

---

[2] The defense introduced Officer Marino's preliminary hearing testimony that Marino, who had prior contacts with Delgado, could not see sufficient detail in the 3507 Drew Street video to identify the shooter.

[3] LAPD criminalist Stacy Vanderschaaf testified an individual may test positive for gunshot residue if he or she

5

The police were not able to identify the vehicle involved in the shooting, and they could not determine how many occupants were inside.

   2.   *The 3405 Drew Street surveillance video and identification of Delgado*

As part of the police investigation into the shooting, Sergeant Giordano contacted Justin Jacobo, who was believed to have access to the video surveillance system for the building at 3405 Drew Street. Three days after the shooting, Sergeant Giordano received an email from Jacobo containing a hyperlink to a Web site containing the 3405 Drew Street video footage. Sergeant Giordano watched the video that day and saw that it captured the shooting, but he did not recognize the shooter. He forwarded the video link to LAPD Officers Marino, Jeremy Massey, and Daniel Kaminski, and to Detective Justin Fuller.

Officer Massey viewed the video on August 28 and recognized Delgado as the shooter. Officer Massey, who was then assigned to the LAPD's gang enforcement detail for the northeast division, had interacted with Delgado on five to 10 earlier occasions, had filled out a field information card on him, and had discussed Delgado's street name and gang affiliation with him. Asked by the prosecution, "How would you describe the quality of that video, specifically in terms of being able to recognize anybody depicted in the video," Officer Massey testified, "I would say it's a very good quality camera and easy to identify people if you knew who they were." Officer Massey was not asked how certain he was of his identification of Delgado. Officer Massey

_____

handled the firearm, even without being the person who discharged it.

6

took a photograph of a frame of the video on his computer that depicted a bald person with Delgado's general characteristics, dressed in a white sleeveless shirt, walking with the firearm to his left side. The photograph was admitted into evidence, and Officer Massey identified Delgado in the courtroom as the man in the photograph. Officer Massey testified the quality of the video was superior to that of the photograph. However, the video was not available at trial.

Officer Massey testified the video showed Delgado[4] in a white sleeveless shirt standing in the front courtyard of 3405 Drew Street with several other people. After looking up Drew Street, Delgado walked into apartment 2 of the building,[5] then emerged from the building carrying an object that appeared to be a firearm. Delgado walked out to the sidewalk as a vehicle traveling south on Drew Street came to a stop near Delgado's position. Delgado pointed the firearm at the vehicle and fired one shot as the vehicle resumed traveling southbound. Delgado walked into the street and fired another shot at the vehicle after it passed. Delgado then walked back into apartment 2. Officer Massey also testified the video showed Alonso emerging from the

---

[4] Defense counsel objected to the prosecution posing questions to Officer Massey about the video that referred to Delgado without qualification, "as though that's a foregone conclusion, and this is not . . . a clear, accurate picture." The trial court ordered the prosecutor to formulate his questions using the term "'the person you've identified as Mr. Delgado,'" finding as to Massey's identification, "[W]hether he's right or wrong is for the jury to decide."

[5] Officer Massey inferred Delgado entered apartment 2 based on the location where Delgado entered the building, although the apartment doorways were not visible within the camera frame.

same area around apartment 2 one minute later carrying what looked like a sheet wrapped around an object. Alonso walked onto the sidewalk and headed north in the direction of 3407 Drew Street.

Officer Kaminksi independently identified Delgado as the shooter after viewing the 3405 Drew Street video. While assigned to the northeast division gang detail, Officer Kaminski encountered Delgado 30 to 50 times over an eight-year period through "various stops, detentions, consensual encounters, and through seeing him on patrol." During patrols, he had seen Delgado "almost daily" in the courtyard in front of 3405 Drew Street, and they had multiple face-to-face encounters and conversations. Officer Kaminski testified he was "absolutely" and "100 percent" certain Delgado was the man he saw in the video. Officer Kaminski testified the photograph admitted at trial was of poorer quality than the video, and he could not identify Delgado with 100 percent certainty from the photograph alone. He stated he could not recognize any of Delgado's tattoos shown on the photograph, including one on the top of Delgado's head. However, he could clearly see Delgado's face in the video.

Officer Jon Hunt also viewed the 3405 Drew Street video and identified Delgado as the shooter. Officer Hunt testified he was familiar with Delgado, having "seen him well over a dozen times in the area of Drew Street," and he had one documented contact with Delgado. Officer Hunt was "very confident" Delgado was the person he saw in the video.

After receiving the link to the surveillance video, Sergeant Giordano called Jacobo to obtain an off-line copy. Jacobo agreed to place the video on a flash drive and drop it off at the police station. But Jacobo never delivered a copy, and the video subsequently became unavailable on the website. On September

21, 2018 Sergeant Giordano and other police officers accessed the video surveillance equipment at 3405 Drew Street, but the footage from August 25 was no longer available because the system had overwritten the recording data after a number of days.  Detective Fuller also attempted to retrieve the video from the Web site operator, but he was informed the file had been deleted by the user and "purged" from the system.

3. *The search of 3405 Drew Street, apartment 2*

On September 21, 2018 LAPD officers executed a search warrant for apartment 2 at 3405 Drew Street.  When the officers arrived, Delgado was sitting outside of the building.  During their search, officers recovered a loaded handgun inside a closet, a box of narcotics, men's clothing, and a medical bracelet and recent hospital paperwork bearing Delgado's name.

4. *The gang expert testimony*

Officer Hunt, who had been assigned to the LAPD gang enforcement detail for the northeast division for 18 months, testified as the prosecution expert on the Avenues gang.  Officer Hunt stated that in order to maintain their territory, street gangs often use violence to establish dominance over rival gangs and to intimidate citizens from cooperating with law enforcement.  A rival gang's intrusion into gang territory would constitute an insult and challenge to the gang's authority that could be met by violence, including shootings and potentially murder.

Officer Hunt testified the Avenues gang has approximately 630 members, and Drew Street is one of the primary strongholds of the gang, where members regularly congregate and socialize.  The Drew Street clique is a prominent sub-group within the Avenues gang.  The primary rivals of the Avenues gang are the

Highland Park gang and the Cypress Park gang. Asked whether Avenues gang members "either individually or collectively engaged in patterns of criminal conduct," Officer Hunt answered in the affirmative. The primary activities of the Avenues gang included vandalism, battery, petty theft, drug possession and sales, weapons violations, assault, murder, and attempted murder.

Officer Hunt testified regarding two predicate offenses committed by members of the Avenues gang. Shawn Webb was convicted of assault with a firearm and shooting at an occupied building in November 2017 (§§ 245, subd. (a)(2), 246). Officer Hunt had spoken to Webb in the field and knew Webb to be a member of the Avenues gang with the moniker "Solo." Officer Hunt was familiar with the facts of Webb's conviction and described the incident: "Shawn Webb was [the] driver of a vehicle where there was another Avenues gang member accompanying him, and they were . . . challenging potential rivals in the Highland Park area . . . where [Webb] participated in shooting at a pedestrian that was on the street and struck an inhabited building as well." Christian Erentreich, whom Officer Hunt knew to be a member of the Avenues gang with the moniker "Hoodlum," was convicted in 2017 of possession of a firearm by a person previously convicted of specified misdemeanors (§ 29805). Officer Hunt testified Erentreich was wanted by police and gave chase in his car when police officers spotted him, and while officers were pursing him, "he threw a loaded shotgun out the car window." Certified copies of the minute orders of Webb's and Erentreich's convictions were admitted at trial.

Officer Hunt opined Delgado was a member of the Avenues gang and the Drew Street clique, and he used the moniker

10

"Chuco." Delgado had admitted he was a member of the gang, had numerous Avenues gang-specific tattoos, associated with other Avenues gang members, and frequented Avenues gang locations, including Drew Street. Four other police officers testified Delgado admitted to being an Avenues gang member.

In response to a hypothetical based on the facts of this case, Officer Hunt opined the shooting was committed for the benefit of and in association with the Avenues gang. Officer Hunt explained that "walking into the middle of the street where there are multiple apartments" to carry out a shooting with a semiautomatic assault weapon "sends a very clear message to the residents there that these gang members have access to high powered weapons, . . . they're willing to use it, and they're willing to shoot at rivals and perceived rivals, which allows them to continue their criminal exploits." Officer Hunt also testified the hypothetical conduct was done in association with the gang because other gang members were present and could act as lookouts, intimidate witnesses, and hide the weapon. Officer Hunt opined possession of a high-powered firearm would benefit the gang because it would intimidate civilians by showing the gang has armor-piercing weapons and make it less likely rivals would "challenge that gang if [rivals] know that they're equipped with an assault type weapon that is capable [of] being fired from a vast distance."

Delgado did not testify or present evidence in his defense. Neither side presented expert testimony on identification.

B.    *Closing Arguments*

The prosecutor in his closing argument directed the jury to "focus on who did it and how we can conclude that it was [Delgado] only." The prosecutor emphasized the officers who

11

identified Delgado from the 3405 Drew Street video testified the video was clear, they made their identifications independently from one another, and "all three recognize[d] from prior contact it's the same guy." The prosecutor urged the jury to consider together "the identification of the video, the fact [Delgado] is in apartment number 2, the fact the shooter walked into apartment number 2 and didn't come out, the fact that the gun came out of apartment number 2, the fact that the defendant was dressed uniquely compared to the other people other gang members who were out there that night . . . . Everything points to the defendant Delgado and his identification."

In his closing argument, defense counsel did not directly address the officers' certainty as to their identifications. After noting that CALCRIM No. 315 "gives you some guidelines as to how you should try to evaluate eyewitness testimony," defense counsel argued the case was "totally different" from a typical eyewitness identification because there was no live witness to the shooting. Further, he argued the jury needed to consider the "the grainy video of the surveillance tape," which the police had admitted was insufficient to identify the shooter. In his rebuttal, the prosecutor argued defense counsel was confusing the video from 3407 Drew Street shown at trial (which did not clearly show Delgado) with the unavailable video from 3405 Drew Street that was the subject of the officers' testimony: "It wasn't grainy, it was not the photograph[] [of the video], and so to be clear when we're talking about the identification of this defendant, it's not from the video of the shooting . . . ." The prosecutor added, "If you choose not to believe the police officers, that's up to you to decide."

12

C.    *The Verdict and Sentence*

The jury found Delgado guilty of shooting at an occupied motor vehicle (§ 246; count 2) and found true the allegations Delgado personally used and intentionally discharged a firearm in the commission of the shooting (§ 12022.53, subds. (b) & (c)) and the shooting was committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(4)).  The jury also found Delgado guilty of possession of a semiautomatic firearm by a felon (§ 29800, subd. (a)(1); count 3)[6] and assault with an assault weapon (§ 245, subd. (a)(3); count 5).  The jury found the firearm enhancement true on count 5 (§ 12022.5, subd. (b)) and the gang enhancement under section 186.22, subdivision (b)(1)(A), true as to counts 3 and 5.[7]

The trial court sentenced Delgado on June 13, 2019.  On count 2, the court imposed an indeterminate term of 35 years to life comprised of 15 years to life for shooting at an occupied vehicle based on the gang enhancement (§ 186.22, subd. (b)(4)), plus 20 years for the firearm enhancement under section 12022.53, subdivision (c).  The court imposed and stayed a 10-year term for the firearm enhancement under section 12022.53, subdivision (b).  On count 3 for possession of a firearm by a felon, the court imposed an additional seven years (the middle term of three years plus four years for the gang enhancement (§ 186.22, subd. (b)(1)(A))) to run concurrently with

---

[6]    The parties stipulated that in March 2000 Delgado suffered a prior felony conviction.

[7]    The jury acquitted Delgado on count 4 for possession of semiautomatic firearm by a felon (§ 29800, subd. (a)(1)) with respect to the firearm recovered from 3405 Drew Street.

13

the sentence on count 2. On count 5 for assault with an assault weapon, the court imposed and stayed (under § 654) an additional 19 years (the middle term of eight years plus five years for the gang enhancement (§ 186.22, subd. (b)(1)(B)) and six years for the firearm enhancement).[8]

Delgado timely appealed.

## DISCUSSION

A. *Instruction with CALCRIM No. 315 Did Not Violate Delgado's Due Process Rights*

Delgado contends the trial court violated his due process rights in instructing the jury with CALCRIM No. 315, which advised the jury that in evaluating an eyewitness identification, the jurors should consider the following question, among other factors: "How certain was the witness when he or she made an identification."[9] Delgado argues this instruction on witness

---

[8] The abstract of judgment was corrected on May 14, 2020 in response to Delgado's request because the reference in the prior abstract on count 5 to a violation of section 245, subdivision (c), for assault with a deadly weapon on a peace officer was a clerical mistake.

[9] The trial court instructed the jury with CALCRIM No. 315, as modified: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. In evaluating identification testimony, consider the following questions: Did the witness know or have contact with the defendant before the event? How well could the witness see the perpetrator? What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions,

14

certainty was erroneous "given the weight of scientific research rejecting certainty as evidence of accuracy." In our earlier opinion, we rejected Delgado's argument because the Supreme Court expressly approved the use of CALJIC No. 2.92, the predecessor to CALCRIM No. 315, against a similar due process challenge based on the inclusion of witness certainty as a factor for consideration.[10] (See *Sánchez, supra*, 63 Cal.4th at p. 462 [no

---

obstructions, distance and duration of observation, and by looking at a video of a surveillance camera? How closely was the witness paying attention? Was the witness under stress when he or she made the observation? Did the witness give a description and how does that description compare to the defendant? How much time passed between the event and the time when the witness identified the defendant? Was the witness asked to pick the perpetrator out of a group? Did the witness ever change his or her mind about the identification? How certain was the witness when he or she made an identification? Are the witness and the defendant of different races? Was the witness able to identify other participants in the crime? Was the witness able to identify the defendant in a photographic or physical lineup? Were there any other circumstances affecting the witness's ability to make an accurate identification?"

[10] In their respondent's brief, the People contended Delgado forfeited his claim of instructional error because defense counsel did not object to the trial court's instruction with CALCRIM No. 315. But we review any claim of instructional error that affects a defendant's substantial rights whether or not trial counsel objected. (§ 1259 ["The appellate court may also review any instruction given . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."]; *People v. Burton* (2018) 29 Cal.App.5th 917, 923 ["'Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's

15

error or prejudice in instructing jury with CALJIC No. 2.92 on witness certainty as a factor relevant to the accuracy of witness's identification]; see also *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 199-200 [*Sánchez* "reiterated three decades of California Supreme Court precedent that a trial court may instruct the jury to consider eyewitness certainty."].)[11]  On April 21, 2021 the Supreme Court granted review.

On the Supreme Court issued its opinion in *Lemcke* on May 21, 2021, and on August 25 it transferred Delgado's appeal back to this court with instructions to vacate our earlier opinion and reconsider the issue in light of *Lemcke*.  We do so now and

---

substantial rights.'"]; *People v. Bedolla* (2018) 28 Cal.App.5th 535, 544 [same].)  And "[w]e can only determine if [a] defendant['s] substantial rights were affected by deciding whether the instruction was given in error and, if so, whether the error was prejudicial."  (*People v. Medina* (2019) 33 Cal.App.5th 146, 154, fn. 7.)  That is, if Delgado's claim has merit, it has not been forfeited.  We therefore necessarily review the merits of Delgado's contention the instruction violated his constitutional rights.  Because we find no forfeiture, we do not reach Delgado's argument his attorney's failure to object constituted ineffective assistance of counsel.

[11]    The Supreme Court in *Sánchez, supra*, 63 Cal.4th at page 462 indicated a willingness to reexamine the witness-certainty factor but found "[a]ny reexamination of our previous holdings in light of developments in other jurisdictions should await a case involving only certain identifications."  Justice Liu stated in a concurrence, "In light of developments in scientific research and recent case law, there is a substantial question whether it is proper for trial courts to instruct that witness certainty is a factor bearing on the accuracy of an identification that juries should consider.  [¶]  The sooner we reexamine this issue, the better."  (*Id*. at p. 498 (conc. opn. of Liu, J.).)

16

conclude instruction with CALCRIM No. 315 did not violate Delgado's due process rights.[12]

### 1. *The Supreme Court's decision in* Lemcke

The Supreme Court in *Lemcke, supra*, 11 Cal.5th 644 rejected a due process challenge to CALCRIM No. 315, holding that "[w]hen considered in the context of the trial record as a whole, listing the witness's level of certainty as one of 15 factors[13] the jury should consider when evaluating identification testimony did not render [the defendant's] trial fundamentally unfair." However, the Supreme Court observed that "[c]ontrary to widespread lay belief, there is now near unanimity in the empirical research that 'eyewitness confidence is generally an unreliable indicator of accuracy.'" (*Id.* at pp. 646-647.) The court explained, "As currently worded, CALCRIM No. 315 does nothing to disabuse jurors of that common misconception, but rather tends to reinforce it by implying that an identification is more likely to be reliable when the witness has expressed certainty. This is especially problematic because many studies have also shown eyewitness confidence is the single most influential factor

---

[12]    A claim that a jury instruction violates due process "involves the determination of applicable legal principles" that we review de novo. (*People v. Alvarez* (1996) 14 Cal.4th 155, 218; accord, *People v. Posey* (2004) 32 Cal.4th 193, 218 ["The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law."].)

[13]    CALCRIM No. 315 lists 15 factors for consideration of eyewitness credibility. The instruction given in this case included the 14 factors noted above, omitting the question, "How much time passed between the event and the time when the witness identified the defendant?"

17

in juror determinations regarding the accuracy of an identification." (*Id.* at p. 647.) The court referred consideration of the instruction to the Judicial Council and its Advisory Committee on Criminal Jury Instructions "to evaluate whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy." (*Ibid.*) The court also directed that until the Judicial Council completes its review, "trial courts should omit the certainty factor from CALCRIM No. 315 unless the defendant requests otherwise." (*Id.* at p. 648.)

In *Lemcke*, Desirae Lemcke and an accomplice, Charles Rudd, were charged with the robbery of Monica Campusano. After a woman in the hallway of a motel distracted Campusano, a man struck Campusano in the face and pulled her into her motel room. The man punched and kicked Campusano repeatedly, causing her to lose consciousness. When she regained consciousness, Campusano was alone in the room, and her purse and phone were gone. (*Lemcke, supra*, 11 Cal.5th at p. 648.) Lemcke and Rudd were identified as suspects, and the responding officer created a six-pack photographic lineup with a photograph of Rudd and showed it to Campusano, who was "'under anesthesia'" at the hospital. (*Ibid.*) Campusano pointed to Rudd's photograph and "stated that she recognized his nose, mouth and jaw area." (*Id.* at pp. 648-649.) Approximately three months later Campusano was shown a photographic lineup with a photograph of Lemcke, and Campusano identified Lemcke as the woman in the motel. She also identified the photograph of Rudd as the one the first officer had shown her at the hospital. (*Id.* at p. 649.) Campusano stated, pointing to Rudd's photograph, "'for sure it was [him].'" (*Ibid.*)

18

Campusano identified Rudd at trial, stating, "'I remember his face, his tattoo and his look, like he was looking with anger.'" (*Lemcke, supra*, 11 Cal.5th at p. 650.) The defense called an eyewitness identification expert, who opined as to witness certainty that "current research suggested that 'confidence' can be 'useful' when there has been a 'fair lineup soon after the event.' However, 'once outside that window and you go forward, that moment in time when [the witness] made an [identification], once you get past that, confidence is not related to accuracy in any regard.'" (*Id.* at p. 651.) The trial court denied Rudd's request to strike the certainty factor from CALCRIM No. 315 in instructing the jury. (*Id.* at p. 652.) The prosecutor in closing argument directed the jury to CALCRIM No. 315 and noted Campusano "'was certain the entire time.'" (*Ibid.*)

Reviewing the instruction on certainty in the context of the instructions as a whole and the trial record, the Supreme Court concluded Rudd's trial was not ""'so infuse[d] . . . with unfairness as to deny due process of law.'"" (*Lemcke, supra*, 11 Cal.5th at p. 655.) The Supreme Court rejected Rudd's contention that CALCRIM No. 315 lowered the prosecutor's burden of proof, citing the finding in *Sánchez, supra*, 63 Cal.4th at pages 461 through 463 that "the instruction does not direct the jury that 'certainty equals accuracy.'" (*Lemcke*, at p. 647.) The court observed that "the wording of the instruction might cause some jurors to infer that certainty is generally correlative of accuracy," but it noted Rudd was allowed to present expert witness testimony to rebut that inference, and the expert opined "the only time certainty may be useful in assessing accuracy is when the identification is made in close temporal proximity to the event and law enforcement has utilized nonsuggestive procedures." (*Id.* at pp. 657-658.) Further, the jury was instructed as to witness

19

testimony that "'[p]eople sometimes honestly . . . make mistakes about what they remember'" and that the jurors were responsible for "'judg[ing] the credibility or believability of the witnesses.'" (*Id.* at p. 658.)  In addition, the jury was instructed that the prosecution had the burden of proving all elements of the crime, which the instruction on eyewitness identity reiterated, stating, "'The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime.  If the People have not met this burden, you must find the defendant not guilty.'"  (*Ibid.*)

The Supreme Court also rejected Rudd's argument that the certainty instruction violated his due process rights by denying him a meaningful opportunity to present a complete defense. (*Lemcke, supra*, 11 Cal.5th at p. 660.)  The court pointed both to the expert testimony and defense counsel's cross-examination of the investigating officers that revealed problems with Campusano's identification, including that her first identification was while she was under anesthesia in the hospital and the second identification used the same photograph.  (*Ibid.*)

Following *Lemcke*, the Supreme Court again considered a challenge to the witness-certainty factor in CALJIC No. 2.92[14] on direct appeal in a capital murder case in *People v. Wright* (2021) 12 Cal.5th 419 (*Wright*).  William Wright was charged with multiple crimes in connection with two drug deals, one in which Wright stabbed Douglas Priest and robbed and shot Julius Martin (*id.* at p. 425), and second in which Wright killed two drug dealers and attempted to kill a third, Mario Ralph (*id.* at

_____

[14]    In *Lemcke, supra*, 11 Cal.5th at page 656, footnote 6, the Supreme Court observed there is no material distinction between CALCRIM No. 315 and CALJIC No. 2.92.

20

p. 426). As to the first incident, Priest and Martin identified Wright about a month after the incident when they saw Wright's photograph on the television news in connection with another crime. (*Ibid.*) Priest and Martin later identified Wright in a live lineup and at the preliminary hearing; Priest also identified Wright at trial. (*Ibid.*) As to the second incident, while Ralph was in the hospital recovering, he identified Wright from a photograph he saw in the newspaper, and Ralph later identified Wright in photographic and live lineups, at the preliminary hearing, and at trial. (*Id.* at pp. 427-428.) At least two of the witnesses knew Wright before the incident. (*Id.* at pp. 425-427.)

Affirming Wright's conviction of first degree murder, attempted murder, and robbery, the Supreme Court held the trial court's instruction with CALJIC No. 2.92 did not violate Wright's due process rights. (*Wright, supra*, 12 Cal.5th at p. 453.) The court explained, "Although the defense below did not present an eyewitness identification expert as had occurred in *Lemcke*, defendant's primary trial strategy was to discredit Ralph, Priest, and Martin, and to imply that the eyewitnesses were testifying falsely. At no point did defendant argue that the witnesses mistook his identity. This was in contrast to *Lemcke*, where the defense strategy focused on questioning the victim's identification of the defendant. [Citation.] The instant case involved the identification of defendant by multiple witnesses, and, unlike in *Lemcke*, at least two of the witnesses had known defendant in some capacity prior to the attack." (*Wright*, at p. 453.) The court further observed the trial court properly instructed the jury how to evaluate evidence and instructed the jury on the believability of a witness. The court concluded, "When considered "'in the context of the instructions as a whole and the trial record'"

21

[citation], the trial court's use of CALJIC No. 2.92 did not violate defendant's due process rights." (*Ibid.*)

    2.    *Inclusion of the witness certainty factor did not violate Delgado's due process rights in light of the jury instructions and record as a whole*

Delgado argues the jury instruction on witness certainty was "especially damaging" in this case because "other than the officers' identifications from the unavailable surveillance footage," there was no other evidence Delgado was the shooter. As discussed, Officer Kaminski testified he was "absolutely" and "100 percent" certain Delgado was the man he saw in the video, and Officer Hunt testified he was "very confident" in his identification.[15] However, the officers' certainty in their identifications was not substantially at issue. Several other factors identified in CALCRIM No. 315 were relevant to the jury's determination of the reliability of the officer's identification. In addition, there was other evidence implicating Delgado.

Most significantly, the jury was instructed that in evaluating identification testimony it should consider, "Did the witness know or have contact with the defendant before the event?" Officers Massey, Kaminski, and Hunt all testified they knew Delgado well, having had contact with him numerous times—Officer Kaminski encountered Delgado 30 to 50 times over an eight-year period through detentions, consensual encounters, and patrols; Officer Massey had previously interacted with Delgado on five to 10 occasions; and Officer Hunt had seen Delgado over a dozen times in the area. This is in stark contrast

---

[15]    Officer Massey did not express his level of certainty in his identification.

to *Lemcke, supra*, 11 Cal.5th at page 649, where Campusano did not know Lemcke or Rudd prior to the attack. Further, unlike in *Lemcke* in which only Campusano identified the defendant, the three officers independently identified Delgado, and the jury was therefore unlikely to have placed much weight, if any, on each officer's degree of confidence in his identification. (See *Wright, supra*, 12 Cal.5th at p. 453.)

The jury was also instructed to consider, "How well could the witness[es] see the perpetrator?" and "What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance and duration of observation, and by looking at a video of a surveillance camera?" Officer Massey testified the quality of the 3405 Drew Street video was superior to the photograph Massey took of the video from his computer screen, and Officer Kaminski explained that although he could not identify Delgado from the photograph alone, Delgado's face was clearly visible in the video. In his cross-examination and closing argument defense counsel rigorously challenged both the quality of the video and the officers' ability to perceive Delgado, but defense counsel did not challenge the officers' attested certainty in their identifications. (See *Wright, supra*, 12 Cal.5th at p. 453 ["[D]efendant's primary trial strategy was to discredit Ralph, Priest, and Martin, and to imply that the eyewitnesses were testifying falsely. At no point did defendant argue that the witnesses mistook his identity."].)

Moreover, there was substantial circumstantial evidence of Delgado's identity as the shooter separate from the officers' identifications. Officer Massey testified the video showed the man he identified as Delgado in a white sleeveless shirt standing in the front courtyard of 3405 Drew Street, entering into apartment 2, emerging with a firearm, and then firing at the

23

passing vehicle. This testimony was corroborated by Massey's photograph of the video showing a bald man of Delgado's general description in a sleeveless white shirt and the video of the shooting from 3407 Drew Street. And when the police executed the search warrant for apartment 2 at 3405 Drew Street a week after the incident, they found Delgado sitting outside of the building, and they recovered items bearing Delgado's name in the apartment. In his closing argument, the prosecutor argued this evidence was sufficient even absent the identifications of Delgado, and he reminded the jury, "If you choose not to believe the police officers, that's up to you to decide."

Under these circumstances, """in the context of the trial record as a whole,"'" the trial court's inclusion of a witness's degree of certainty in an identification among the factors the jury could consider when evaluating the identification testimony "did not render [the] trial fundamentally unfair" and did not violate Delgado's due process rights. (*Lemcke, supra*, 11 Cal.5th at p. 646; accord *Wright, supra*, 12 Cal.5th at p. 453.)

B.    *Assembly Bill 333 Requires Reversal of the Gang Enhancements*

1.    *Assembly Bill 333's amendments to section 186.22*

Section 186.22 provides for enhanced punishment when a defendant is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) Effective January 1, 2022, Assembly Bill 333 made significant modifications to the requirements for proving a criminal street gang enhancement. As relevant here, a "'criminal street gang'" was formerly defined in section 186.22,

24

subdivision (f), as "any ongoing organization, association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of acts enumerated in [section 186.22, subdivision (e)(1)-(25) and (31)-(33)], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." Subdivision (f) now defines a criminal street gang as "an ongoing, organized association or group of three or more persons, whether formal or informal," and requires that members of the gang "*collectively* engage in, or have engaged in a pattern of criminal gang activity" (rather than "individually or collectively," under the previous law).  (Italics added.)

Assembly Bill 333 also modified the definition of "'pattern of criminal gang activity'" in section 186.22, subdivision (e). Formerly, the law required proof of two or more predicate offenses enumerated in that subdivision, "provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons."  As amended, subdivision (e)(1) now requires proof that "at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offense is

more than reputational."[16]  (§ 186.22, subd (e)(1).)  Further, "[t]he currently charged offense shall not be used to establish the pattern of criminal gang activity."  (§ 186.22, subd. (e)(2).)  New section 186.22, subdivision (g), provides, "As used in this chapter, to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational.  Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."

In addition to the definitional changes, Assembly Bill 333 added section 1109, which requires, if requested by the defendant, that trial of a gang enhancement charged under section 186.22, subdivision (b), be bifurcated from and follow trial of the underlying offenses.  (§ 1109, subd. (a); Stats. 2021, ch. 699, § 5, pp. 11-12.)  The bill also amends section 186.22, subdivision (b)(3), effective January 1, 2023, to provide that the sentencing court "shall order the imposition of the middle term of the sentence enhancement, unless there are circumstances in aggravation or mitigation" (Stats. 2021, ch. 699, § 4, p. 10), whereas the existing law provides the court "shall select the

---

[16]     Section 186.22, subdivision (e)(1), was also amended to limit the predicate offenses that can be used to establish a pattern of criminal gang activity, removing vandalism, looting, and a number of fraud-related offenses.  Section 186.22, subdivision (f), which formerly referred to "criminal acts enumerated in paragraph (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e)" now simply refers to "the criminal acts enumerated in subdivision (e)."

sentence enhancement that, in the court's discretion, best serves the interests of justice. . . ."  (§ 186.22, subd. (b)(1)(C)(3).)

Delgado contends, the People concede, and we agree Assembly Bill 333's amendments to section 186.22 that became effective January 1, 2022 apply retroactively to Delgado's conviction under the principles enunciated in *In re Estrada* (1965) 63 Cal.2d 740.  In *Estrada*, the Supreme Court held that statutory amendments that reduce the punishment for an offense apply retroactively to a defendant whose judgment is not yet final absent a contrary legislative intent.[17]  (*Id*. at p. 745; see *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299 [discussing *Estrada* and its progeny].)  Although the amendments effective in 2022 do not alter the punishment imposed for a gang enhancement, *Estrada* retroactivity applies because the amendments increase the threshold for imposition of the enhancement.  (*People v. Lopez* (2021) 73 Cal.App.5th 327, 344 (*Lopez*) ["As Assembly Bill 333 increases the threshold for conviction of the section 186.22 offense and the imposition of the enhancement, we agree with [defendant] and the People that [defendant] is entitled to the benefit of this change in the law."]; see *People v. Nasalga* (1996) 12 Cal.4th 784, 792 ["The rule in *Estrada* has been applied to

---

[17]    The amendment to section 186.22, subdivision (b)(3), constraining the trial court's discretion to impose the upper (or lower) term of a gang enhancement does not take effect until January 1, 2023.  If the People elect to retry the gang enhancements and the jury finds they are true, the law in effect at the time of sentencing would apply to Delgado's resentencing; however, the trial court may consider that if Delgado again appeals, the amendment to subdivision (b)(3) would apply if Delgado's judgment of conviction is not final as of January 1, 2023.

statutes governing penalty enhancements, as well as to statutes governing substantive offenses."]; *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 301 [statutory amendments that "redefine, to the benefit of defendants, conduct subject to criminal sanctions" apply to cases pending on appeal]; *People v. Millan* (2018) 20 Cal.App.5th 450, 455-456 [amendment narrowing list of convictions qualifying for imposition of enhancement applies retroactively].)

> 2. *We cannot conclude beyond a reasonable doubt the jury based its true finding on the gang enhancement on a finding members of the Avenues gang collectively engaged in a pattern of criminal activity*

Delgado contends that in light of the amendments to section 186.22, the gang enhancements must be reversed because the trial court erred in instructing the jury under former subdivision (f) that it could find the gang enhancements true if the People proved that members of the Avenues gang, "whether acting alone or together, engage in or have engaged in a pattern of criminal gang activity." Delgado argues amended subdivision (f)'s requirement that gang members "collectively engage" in a pattern of criminal gang activity means the People were required to prove that two or more gang members committed each predicate offense in concert, and here, no evidence was presented that multiple Avenues gang members committed the predicate offenses. The People contend that under subdivision (f), proof that individual gang members committed the predicate offenses on separate occasions is sufficient to show the gang members "collectively" engaged in a pattern of criminal activity, and therefore reversal is not required because the People presented evidence that two different Avenues gang members committed

28

the predicate offenses on separate occasions.  Delgado has the better argument.

We review questions of statutory construction de novo. (*People v. Lewis* (2021) 11 Cal.5th 952, 961; *California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1041.)  "'""As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.]  We begin by examining the statute's words, giving them a plain and commonsense meaning.""'"" (*Lewis*, at p. 961; accord, *People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.)  "'"[W]e look to 'the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . [Citation.]' [Citation.]  That is, we construe the words in question "'in context, keeping in mind the nature and obvious purpose of the statute. . . ." [Citation.]' [Citation.]  We must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.""'"" (*Lewis*, at p. 961.)  "'If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.'" (*Mendoza v. Fonseca McElroy Grinding Co., Inc.* (2021) 11 Cal.5th 1118, 1125; accord, *People v. Superior Court (Arnold)* (2021) 59 Cal.App.5th 923, 931.)

As a threshold matter, we read the term "collectively" in a commonsense manner to mean what it says—committed by more than one person, and not, as argued by the People, individually but on a different day.  Our reading is consistent with the Senate Rules Committee's analysis of Assembly Bill 333, which described the amendment to section 186.22, subdivision (f), as requiring

29

"that engagement in a pattern of criminal activity must be done by members collectively, not individually." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 333 (2021-2022 Reg. Sess.) as amended July 13, 2021, p. 4.) Further, both before and after amendment, the definition of a "pattern of criminal gang activity" in section 186.22, subdivision (e) (now subdivision (e)(1)), requires the commission of two predicate offenses that "were committed on separate occasions or by two or more members." Thus, the prosecution could meet this requirement by proving two gang members individually committed the predicate offenses on two separate occasions or two gang members collectively committed two predicate offenses on the same date. Under the People's interpretation of the change to subdivision (f), removal of the word "individually" simply means it is no longer sufficient for a single individual to commit both predicate offenses on different days, but rather, a different individual must commit each offense. Such a minimal change to the statute is inconsistent with the Legislature's intent to significantly limit the scope of the gang enhancement.

As the Senate Committee on Appropriations bill analysis described Assembly Bill 333, the amendment was designed to "narrow the conduct that is prosecutable, and lead[s] to enhanced sentences, as criminal street gang activity . . . ." (Sen. Com. on Appropriations, Analysis of Assem. Bill No. 333 (2021-2022 Reg. Sess.) as amended July 13, 2021, p. 1.) Section 2 of the legislation likewise makes clear the Legislature's intent to dramatically limit the scope of the gang enhancement because of its criminalization of "entire neighborhoods historically impacted by poverty, racial inequality, and mass incarceration," disproportionate impact on people of color, and legitimization of severe punishment. (2021 Stats., ch. 699, § 2, subds. (a), (d)(1) &

30

(2), (i), pp. 2-4.)  Reading the amendment to section 186.22, subdivision (f), to limit application of the gang enhancement to situations where individual gang members commit the predicate offenses on separate occasions would do little to further this legislative purpose.

Our colleagues in Division Eight recently reached a similar conclusion as to the interpretation of amended section 186.22, subdivision (f), in *Lopez, supra*, 73 Cal.App.5th at pages 344 to 345, observing that where the People had introduced evidence as to the predicate offenses that one gang member committed two murders and another gang member committed a carjacking and robbery, "The evidence that these gang members individually engaged in a pattern of criminal gang activity was sufficient at the time of trial to meet the requirements of section 186.22, but when it becomes effective, Assembly Bill 333 will require the prosecution to prove collective, not merely individual, engagement in a pattern of criminal gang activity."  Although the court reversed the gang enhancement based on Assembly Bill 333's modifications to section 186, subdivision (e)(1), and new subdivision (g), the court nonetheless found "[n]o evidence was introduced at trial to establish that the crimes committed by [the gang members] constitute collective criminal activity by the 18th Street gang." (*Lopez*, at p. 345.)

The People contend that even though the trial court instructed the jury that it could find the gang enhancements true based on individual or collective gang activity, the instructional error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24.  Where a trial court instructs the jury on two legal theories, one of which is legally erroneous— here, that the jury could find the gang enhancements true based on a finding gang members individually engaged in a pattern of

criminal gang activity—"[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 13 [erroneous instruction that jury could consider a box cutter an inherently deadly weapon constituted harmless error because no reasonable jury would have failed to find defendant used the box cutter in a deadly manner]; *People v. Chiu* (2014) 59 Cal.4th 155, 167 [error in instructing jury on first degree murder was not harmless where record "show[ed] that the jury may have based its verdict of first degree premeditated murder on the [now erroneous] natural and probable consequences theory," and thus, on appeal the court could not "conclude beyond a reasonable doubt that the jury based its [first degree murder] verdict on the legally valid theory that defendant directly aided and abetted the murder"]; see *Chapman v. California, supra*, 386 U.S. at p. 24.)

We cannot conclude beyond a reasonable doubt that the jury imposed the gang enhancements on a now legally-valid ground under Assembly Bill 333's amendments. The prosecution's gang expert, Officer Hunt, was asked only whether Avenues gang members "either individually or collectively engaged in patterns of criminal conduct," to which he responded, "They have." Officer Hunt testified as to one of the predicate offenses that Avenues gang member Erentreich was convicted in 2017 of possession of a firearm based on his throwing a loaded shotgun out of his car window while fleeing police. Officer Hunt did not testify that any other gang member was involved in the

crime, nor does the minute order of Erentreich's conviction show that other gang members were involved in the crime.[18]

Accordingly, we reverse the true findings on the gang enhancement. We agree with the People, however, that the proper remedy is to remand to give the prosecution an opportunity to retry the gang enhancement under current law. (See *Lopez, supra*, 73 Cal.App.5th at p. 346 [vacating gang enhancements in light of Assembly Bill 333 and remanding for limited retrial]; *People v. Figueroa* (1993) 20 Cal.App.4th 65, 71-72, fn. 2 [remand appropriate to allow prosecution to establish additional element retroactively added by statutory amendment]; cf. *People v. Nasalga, supra*, 12 Cal.4th at p. 798 [declining to remand for retrial of amount of property loss for purposes of determining applicable sentence under amendment to sentencing law because the People proved amount of loss at prior trial, leaving nothing to retry].)

## DISPOSITION

Delgado's convictions of shooting at an occupied motor vehicle, possession of a semiautomatic firearm by a felon, and assault with an assault weapon, and the jury's true findings on the firearm enhancements are affirmed. The jury's true findings that Delgado committed the offenses for the benefit of a criminal

---

[18] Because the People were required to introduce evidence of at least two predicate offenses to prove a pattern of criminal gang activity, we need not resolve whether the evidence as to the second predicate offense showing Webb was accompanied by a fellow gang member when he committed assault with a firearm was sufficient to establish collective engagement in criminal gang activity.

street gang are reversed.  The cause is remanded to provide the People an opportunity to retry the criminal street gang enhancement.  If the People elect not to do so, Delgado is to be resentenced in a manner consistent with this opinion.


                                        FEUER, J.

We concur:


        PERLUSS, P. J.


        SEGAL, J.