Filed 11/26/25  P. v. Miles CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C101105 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-FECOD-2017-0000919) |
| v. | |
| HAROLD MILES, | |
| Defendant and Appellant. | |

In 2018, a jury found defendant Harold Miles guilty of attempted second degree robbery and attempted first degree murder, and, in finding him guilty of attempted first degree murder, found true the allegation that he committed the attempted murder willfully and with deliberation and premeditation.  On December 16, 2022, defendant filed a petition for resentencing under former Penal Code[1] section 1170.95, which has since been renumbered as section 1172.6.  The trial court found that defendant made a prima facie showing in his petition, and, after a hearing, denied the petition, concluding, beyond a reasonable doubt, that defendant was a direct aider and abettor who acted with

---

[1]     Undesignated section references are to the Penal Code.

1

the intent to kill and could still be convicted of attempted murder despite the changes to sections 188 and 189.

Defendant appeals, arguing that (1) the trial court erred in finding that the attempted murder charge had been established beyond a reasonable doubt, and (2) the premeditation enhancement must be reversed. We conclude defendant is ineligible for section 1172.6 relief as a matter of law, and that his contention concerning the premeditation enhancement is not properly raised on a section 1172.6 petition for resentencing. We will affirm.

BACKGROUND

*Factual Background, Trial, and Sentencing*

Our recitation of the factual background is quoted from our prior unpublished opinion in the appeal from the judgment. (*People v. Stinson et al.* (Mar. 4, 2022, C087504) [nonpub. opn.] (*Stinson*).) That opinion referred to the murder victim as "the father" and the attempted murder victim as "the son." For consistency, we will do the same here.

"In November 2015, the father lived in a triplex, along with the son. A common courtyard led to the front door of the duplex. An iron gate separated the courtyard from the street, and the gate was kept locked. An additional metal security door secured the entrance to the father's home. The security door could be opened only by using a key to unlock a double deadbolt. The father sold marijuana and often had some at the house, along with large amounts of cash. He also owned a pit bull.

"Stinson and Miles lived in separate residences on the same street as the father; they were familiar with the father and had been to his home. The father was so familiar with Stinson that he nicknamed him 'little nephew.'

"On November 4, 2015, the father was home with his girlfriend, his girlfriend's two children, and the son. At one point, the father left to get air in his car's tires. Two men wearing black hoodies approached the front gate and asked one of the girlfriend's

2

children if the father was there. The men sounded mad. The child told them the father was not there, and the men left. The child testified one of the men was Stinson.

"The father eventually returned home. The girlfriend heard him arguing with someone outside. She heard the father beg, 'Just take the money. That's all I have.' The father continued, 'Please, just take it. My family's in there. It's right there. Don't kill me.' The girlfriend heard a 'tussle,' so she told the son to check on the father. The girlfriend then heard multiple gunshots and hid with her children under a bed.

"The son, who was unarmed, ran to the front door but he could not open the locked security door. Through the security door, the son saw the father and a man in a black hoodie grabbing each other in the courtyard. Although the son did not recognize the man at the time, he later identified him as Miles. The son then ran out the back door of the house, jumped over a fence into his neighbor's yard, and ran toward the front of the house. After the son ran out the door, one of the girlfriend's children heard a dog barking. The child then heard more gunshots.

"Meanwhile, as the son was running outside towards the front of the house, he also heard gunshots. It sounded as if the shots were coming from the front of the house. As the son climbed to the top of another fence to get to the father, he saw and immediately recognized Miles, who appeared unarmed, and Stinson, who was using both hands to hold a shotgun. Stinson shot the son and he fell.[2] The son screamed and asked Stinson

---

**2**    In addition to the factual background from our prior opinion, defendant emphasizes an additional portion of the son's trial testimony:
[DEPUTY DISTRICT ATTORNEY]: "Q    Okay. And what, if anything, did you see [defendant] doing when you got up on top of that fence?
[THE SON]: "A    He was frozen.
[DEPUTY DISTRICT ATTORNEY]: "Q    Just standing?
[THE SON]: "A    Looking at me.
[DEPUTY DISTRICT ATTORNEY]: "Q    Okay. Was he facing your direction?
[THE SON]: "A    Yes.

what he was doing. The son stood up and retreated to the backyard. As he was running, he heard another shot, and it sounded the same as Stinson's first shot at him. The son eventually got back into the father's house. The son's chest hurt, and he discovered that had been hit in the chest with shrapnel from the shotgun.

"The son looked out the father's front door and saw Miles and Stinson running down the street toward the corner. He did not notice anyone else, but he kept his focus on the two men. The son then saw the father lying face down, bleeding and unresponsive. Medical help arrived, but the father died at the scene from 18 gunshot wounds, including three to his chest and abdomen. The son later identified Stinson and Miles in a police photo lineup.

"A. *Additional witness testimony*

"Four witnesses who were near the father's home at the time of the incident testified they heard gunshots. One witness testified he heard a shot from a handgun followed by a pause and then a shot from a shotgun.

"A neighbor also testified he heard four to five gunshots as he was standing outside his home. He then saw two men try to enter a house. One of the men had a 'fade' haircut, and the other had dark hair with the tips dyed a lighter color, possibly yellow. Based on news reports, the neighbor later recognized the man with the fade haircut as Miles. The neighbor heard Miles tell his companion, 'Put that gun in your pants.' The two men then took off running at a 'frantic pace.' The neighbor saw a gun barrel sticking out of the top of the pants of the man with the dyed hair. The firearm appeared to be a rifle or a shotgun.

---

[DEPUTY DISTRICT ATTORNEY]: "Q    Did you say anything to him?
[THE SON]: "A    Didn't give him time to.
[DEPUTY DISTRICT ATTORNEY]: "Q    What happened?
[THE SON]: "A    I was shot."

"The day after the shooting, the neighbor picked Stinson and Miles out of a police photo lineup. The investigating officer testified the neighbor made the identification without hesitation. . . .

"A fifth witness who was driving in the area testified he saw a pit bull running in the street. He then saw three men run around a corner and get into a parked vehicle, with two getting in the front and the third getting in the back. All three men wore black hoodies.

"B.    *Police investigation*

"Police arrived and found bullet holes in the fence. In the backyard, they found the father's dog shot dead. Police found $65 cash inside the father's shirt breast pocket. While searching the father's home, they found a loaded .40-caliber handgun in the master bedroom. Police did not find any empty casings associated with the gun and they did not find any other weapons in the home.

"Police found marijuana in the kitchen, two digital scales, plastic sandwich baggies, and foil bags. There also were plastic baggies containing marijuana. A detective testified at trial that, in his opinion, the items found indicated the marijuana was intended for sale.

"Police found multiple bullet casings, expended bullets, and bullet fragments in or near the courtyard, garage, driveway, and front door. In all, police found seven .45-millimeter [*sic*] casings and nine .10-millimeter [*sic*] casings at the scene. Police also found one .223 cartridge (live round) in the driveway, one casing in the garage, and one casing in the front yard of the house next door. In addition, there was a bullet strike in the fence that separated the father's house from the neighbor next door.

"The forensic pathologist who conducted the autopsy on the father opined the shooter had used a handgun, probably a .10-millimeter [*sic*] or .45-caliber, rather than a rifle or shotgun. In addition, the father had been shot from at least three feet away.

[¶] · · · [¶]

5

"C.    *Stinson's testimony*

"Stinson testified that on the day of the shooting he was inside his home when he heard gunshots.  He looked out his front door and realized his dog had run outside.  Scared his dog would get hurt or hurt someone, Stinson grabbed his loaded rifle and went outside to find his dog.

"Stinson then saw a man coming over the neighbor's fence holding a handgun.  Stinson did not recognize the man, who wore his hair in dreadlocks.  Scared, Stinson fired a single shot above the man in an attempt to scare him.  The man fell, and Stinson began running.  Stinson saw Miles, who is Stinson's brother-in-law.  Miles, who was not holding a gun, seemed '[f]rantic.'  Stinson asked Miles to help him find his dog, and Miles agreed.  The two ran as they searched for Stinson's dog.  At one point, Stinson put his gun in his shorts. . . .

[¶] . . . [¶]

"D.    *Verdict and sentencing*

"In April 2018, the jury found Stinson guilty of first degree murder of the father (Pen. Code, § 187, subd. (a)); attempted second degree robbery of the father (§§ 664, 211); attempted first degree murder of the son (§§ 664, 187, subd. (a)); and animal cruelty by shooting or killing a living dog.  (§ 597, subd. (a).)  The jury also found Stinson committed the murder while committing a robbery.  (§ 190.2, subd. (a)(17)(A).)  The jury found not true the firearm enhancement allegations to each of the charges against Stinson.  (§§ 12022.53, subds. (b)-(d), 12022.5, subd. (a).)

"On the same day, the jury found Miles guilty of attempted second degree robbery of the father (§§ 664, 211) and attempted first degree murder of the son.  (§§ 664, 187, subd. (a).)  In finding Miles guilty of first degree attempted murder, the jury found true that Miles committed the attempted murder willfully and with deliberation and premeditation.  The jury found not true the firearm enhancement allegations to each of the charges against Miles.  (§§ 12022.53, subds. (b)-(d), 12022.5, subd. (a).)

6

"The jury was deadlocked on allegations that Miles committed first degree murder of the father (count 1), and that Miles and Stinson unlawfully possessed a firearm (counts 5 & 6), and the court declared a mistrial as to those counts.

[¶] . . . [¶]

"The court sentenced Miles to six years (the upper term of three years doubled) for the attempted robbery charge, consecutive to life with the possibility of parole for the attempted murder charge." (*Stinson, supra*, C087504, fn. omitted].)

*The Petition for Resentencing, Denial, and Appeal*

Defendant filed a petition for resentencing under former section 1170.95, now renumbered as section 1172.6. The trial court concluded that defendant had made a prima facie showing and set the matter for a hearing. The court took judicial notice of the entire record of conviction, including our prior opinion in *Stinson, supra*, C087504.

After a hearing, the trial court found, beyond a reasonable doubt, that defendant was a direct aider and abettor with intent to kill and could still be convicted of attempted murder despite the changes to sections 188 and 189. After setting forth its findings as to the underlying facts, the court concluded as follows:

"[T]he People's sole theory at trial was based upon a direct aider and abetter [*sic*] theory to the attempted murder of [the son], and I believe the defense conceded at the order to show cause hearing that there were no jury instructions given with regard to natural and probable consequences liability or that doctrine.

"As the People pointed out in their brief and attached the jury instructions, the jurors were given CALCRIM 400 and 401 regarding aiding and abetting, and CALCRIM 600 and 601 regarding the requirements for attempted murder and deliberation and premeditation, and taken together those instructions directed the jury that in order to find [defendant] guilty of the attempted murder of [the son], the jury had to find the defendant had the intent to kill in aiding and abetting the attempted murder.

7

"The law is clear that jurors are presumed to follow the court's instructions, and finding the defendant guilty of the attempted murder of [the son], the jury found the defendant, [defendant], acted with the intent to kill.

[¶] . . . [¶]

"And so based on the state of the law, the facts of the case, the theory on which the People proceeded, the jury's verdicts and findings, the pleadings filed in accordance with . . . Section 1172.6 and the evidence and the arguments presented by the parties at the order to show cause hearing, the Court finds that the People have presented sufficient evidence to establish beyond a reasonable doubt that the defendant could still be convicted of attempted murder despite the recent changes to . . . Sections 188 and 189.

"The Court also finds that with the standard of proof being beyond a reasonable doubt, that the defendant is guilty of attempted murder.

"And on those bases that the defendant's petition for resentencing is denied."

Defendant filed a timely notice of appeal.  In two subsequent orders, we treated motions by defendant as requests to incorporate by reference this court's unpublished opinion and record in *Stinson*, *supra*, C087504, and as such, granted the motions.  (Cal. Rules of Court, rules 8.147 & 8.155.)  We deny as moot the People's duplicative request.

DISCUSSION

I

*Senate Bill No. 1437*

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill No. 1437) amended "the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life."  (Stats. 2018, ch. 1015, § 1, subd. (f).)  Senate Bill No. 775 (2021-2022 Reg. Sess.) (Senate Bill No. 775) amended what is now section 1172.6 to expand its coverage to include individuals convicted of

"attempted murder under the natural and probable consequences doctrine . . . ." (Stats. 2021, ch. 551, § 2; § 1172.6, subd. (a).)

Senate Bill No. 1437 also created, in what is now section 1172.6, a mechanism for individuals convicted of qualifying offenses to petition for resentencing. If the trial court finds that a petitioning defendant has made a prima facie showing of entitlement to relief, the court must issue an order to show cause and hold an evidentiary hearing. (§ 1172.6, subds. (c) & (d).) At that hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

II

*Eligibility for Section 1172.6 Resentencing as a Matter of Law*

A.    *Aiding and Abetting Attempted Murder*

"A person who aids and abets the commission of a crime is culpable as a principal in that crime. [Citation.] Aiding and abetting is not a separate offense but a form of derivative liability for the underlying crime. [Citation.] Our law recognizes two forms of liability for aiders and abettors. [Citation.] First, under direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.' [Citation.] [¶] Second, under the natural and probable consequences doctrine, an accomplice is guilty not only of the offense he or she directly aided or abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the 'natural and probable consequence' of the crime the accomplice aided and abetted (i.e., the nontarget offense)." (*People v. Gentile* (2020) 10 Cal.5th 830, 843, abrogated on another ground as stated in *People v. Oyler* (2025) 17 Cal.5th 756, 836.)

9

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) "Through legislation enacted in 2018 and 2021," specifically Senate Bill Nos. 1437 and 775 respectively, "the Legislature eliminated the natural and probable consequences theory of murder and attempted murder." (*People v. Richee* (2025) 111 Cal.App.5th 281, 294.) However, the legislation did not eliminate a direct aider and abettor theory of attempted murder. (See *People v. Gentile, supra*, 10 Cal.5th at p. 848 ["Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder"]; *People v. Cortes* (2022) 75 Cal.App.5th 198, 204-205 [petitioner convicted of murder and attempted murder either as perpetrator or direct aider and abettor ineligible for § 1172.6 relief].)

B.    *CALCRIM No. 400 As Given*

The trial court here instructed the jury with CALCRIM No. 400 on general principles of aiding and abetting as follows:  "A person may be guilty of a crime in two ways.  One, he may have directly committed the crime.  I will call that person the perpetrator.  Two, he may have aided and abetted a perpetrator who directly committed the crime.  [¶]  A person is guilty of a crime whether he committed it personally or aided and abetted the perpetrator.  [¶]  *Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime*."  (CALCRIM No. 400, italics added.)

The italicized portion of the instruction appears in brackets in the CALCRIM instructions.  The bench notes specify, in part:  "If the prosecution is also relying on the natural and probable consequences doctrine, the court should also instruct with the last bracketed paragraph," and "If the prosecution's theory is that any of the crimes charged were committed as a natural and probable consequence of the target crime, CALCRIM

10

No. 402 or 403 should also be given." (Judicial Council of Cal., Crim. Jury Instns. (2025) Bench Notes to CALCRIM No. 400.)

C. *Law of the Case*

The People argue that the law of the case doctrine bars defendant's claim to relief because defendant already raised on his prior appeal the issue he raises here, and another panel of this court rejected his contention. We disagree.

The law of the case doctrine provides that, "where, upon an appeal, the [reviewing] court, in deciding the appeal, states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal . . . ." (*People v. Stanley* (1995) 10 Cal.4th 764, 786.) However, for the doctrine to apply, the "point of law involved" must have been "necessary to the prior decision" and must have been " ' "actually presented and determined by the court." ' " (*People v. Gray* (2005) 37 Cal.4th 168, 197.) Generally, the law of the case doctrine "does not apply to arguments that might have been but were not presented and resolved on an earlier appeal." (*Leider v. Lewis* (2017) 2 Cal.5th 1121, 1130.)

Defendant argues here that the trial court's instructions, specifically the last sentence of CALCRIM No. 400, allowed the jury to convict him of attempted murder under the natural and probable consequences doctrine. Defendant did not make this argument on his appeal from the judgment. This argument was not " ' "actually presented and determined" ' " by this court on defendant's prior appeal (*People v. Gray*, *supra*, 37 Cal.4th at p. 197), and therefore it is not barred as law of the case.

D. *Analysis*

Defendant argues that he is eligible for section 1172.6 resentencing because the last sentence of CALCRIM No. 400 "injected" the natural and probable consequences theory into the case, and he was prosecuted under that theory. We disagree.

11

"Whether the record of conviction shows the petition is ineligible for section 1172.6 relief as a matter of law is a legal question that we review de novo." (*People v. Rushing* (2025) 109 Cal.App.5th 1025, 1030 (*Rushing*).)

Again, the last sentence of CALCRIM No. 400 instructed the jury: "Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime." (CALCRIM No. 400.) Of course, we "must consider the instructions together as a whole, to determine whether it is reasonably likely a jury would interpret an instruction in a particular way, because we presume jurors understand and correlate all of the instructions." (*People v. Burton* (2018) 29 Cal.App.5th 917, 925.)

In *People v. Estrada* (2022) 77 Cal.App.5th 941, the jury was instructed with the same sentence from CALCRIM No. 400. (*Estrada,* at p. 946.) On appeal from an order denying his petition for resentencing, the defendant argued that he may have been convicted of first degree murder under the natural and probable consequences doctrine. (*Id*. at p. 945.) The Court of Appeal found that the sentence from CALCRIM No. 400 did not sufficiently instruct the jury on the natural and probable consequences doctrine so as to give rise to potential Senate Bill No. 1437 relief. (*Estrada,* at p. 945.) The appellate court stated that the jury instructions as a whole " 'ensured that the jury would only find Estrada guilty of first degree murder, even as an aider and abettor, if it concluded he acted willfully and with intent to kill . . . .' " (*Ibid*.) The court found it significant that the trial court did not instruct the jury with CALCRIM Nos. 402 or 403 on the natural and probable consequences doctrine, and *did* instruct with CALCRIM No. 401 on aiding and abetting liability. (*Estrada,* at pp. 946-947.) The court found that, "given our prior holding that the jury instructions, taken as a whole, required the jury to find that Estrada acted with intent to kill in order to find him guilty of first degree murder, even under an aider and abettor theory, we do not find that the bracketed language alone is sufficient to

find that the jury was instructed on a natural and probable consequences theory." (*Id*. at p. 947.)

In reaching its conclusion, the *Estrada* court relied on *People v. Johnson* (2016) 62 Cal.4th 600, in which the jury was instructed with a prior version of CALCRIM No. 400 which, in language similar to the current second paragraph of that instruction but with a significant difference, provided, in part: " ' "A person is *equally guilty* of the crime whether he committed it personally or aided and abetted the perpetrator who committed it." ' " (*People v. Estrada, supra,* 77 Cal.App. at p. 947, quoting *Johnson,* at p. 638.) The court continued: "The [*Johnson*] court held that where CALCRIM No. 401 is also provided, 'there was no reasonable likelihood the jurors would have understood the "equally guilty" language in CALCRIM former No. 400 to allow them to base defendant's liability for first degree murder on the mental state of the actual shooter, rather than on defendant's own mental state in aiding and abetting the killing.' [Citation.] Here, where the 'equally guilty' language was no longer present in the version of CALCRIM No. 400 provided to the jury, there is even less of a possibility that the jury could have imputed Estrada's liability for first degree murder from the mental state of the actual shooter. Applying *Johnson*, Estrada is ineligible for resentencing as a matter of law because the jury was instructed on CALCRIM No. 401." (*Estrada,* at pp. 947-948.) The court also noted that the prosecutor never requested that the trial court instruct the jury with CALCRIM Nos. 402 and 403, and did not rely on the natural and probable consequences doctrine in the closing argument. (*Estrada,* at pp. 948-949.) The court concluded that the defendant was not eligible for resentencing relief. (*Id*. at p. 949.)

The court in *Rushing, supra*, 109 Cal.App.5th 1025 recently reached the same conclusion. Again, the jury was instructed with the same sentence from CALCRIM No. 400. (*Rushing,* at p. 1031.) After discussing *Estrada*, the Court of Appeal noted that, like *Estrada*, the trial court did not instruct the jury with CALCRIM Nos. 402 or 403. (*Rushing,* at p. 1031.) The court continued: "The bracketed language in CALCRIM No.

13

400 was not a self-contained instruction on the natural and probable consequences doctrine. It informed the jury of the possibility that a person may be found guilty of other crimes that occurred during the commission of the crime that he or she originally aided and abetted. But it did not discuss the specific circumstances under which this may occur. It was incomplete without CALCRIM No. 402 or 403. As in *Estrada*, CALCRIM No. 401 was the only complete instruction on accomplice liability that the trial court read to the jury." (*Rushing,* at pp. 1031-1032.) The court found that, in light of the instructions given, CALCRIM Nos. 400, 401, 520, and 521, "[t]o convict Rushing of second degree murder, the trial court's instructions permitted the jury to find that he was a perpetrator or a direct aider and abettor of express or implied malice murder. The guilty verdict on second degree murder itself does not amount to a jury finding that Rushing was liable under the natural and probable consequences doctrine. Nor does it suggest the jury relied on the bracketed language in CALCRIM No. 400." (*Rushing,* at pp. 1032-1033, fn. omitted.) As in *Estrada*, the court in *Rushing* noted that the prosecutor did not rely on the natural and probable consequences doctrine in the closing argument. (*Id*. at p. 1034.) The court concluded the defendant was ineligible for section 1172.6 relief. (*Rushing,* at pp. 1034-1035.)

We reach the same conclusion here. The trial court instructed the jury with the same sentence from CALCRIM No. 400 as was at issue in *Estrada* and *Rushing.* As in those cases, the trial court did not instruct the jury with CALCRIM Nos. 402 or 403, which defendant concedes. Contrary to defendant's argument, the jury was not indirectly instructed on the natural and probable consequences doctrine. The last sentence of CALCRIM No. 400 "was not a self-contained instruction on the natural and probable consequences doctrine. It informed the jury of the possibility that a person may be found guilty of other crimes that occurred during the commission of the crime that he or she originally aided and abetted. But it did not discuss the specific circumstances under which this may occur. It was incomplete without CALCRIM No. 402 or 403. As in

14

*Estrada*, CALCRIM No. 401 was the only complete instruction on accomplice liability that the trial court read to the jury." (*Rushing, supra*, 109 Cal.App.5th at pp. 1031-1032.)

CALCRIM No. 401 instructed the jury, in part: "To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that, one, the perpetrator committed the crime. [¶] Two, the defendant knew that the perpetrator intended to commit the crime. [¶] Three, before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing the crime. [¶] And four, the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to and does in fact aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime." (CALCRIM No. 401.) "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.) Thus, the jury necessarily found that defendant knew Stinson intended to kill the son and defendant intended to and did "aid, facilitate, promote, encourage, or instigate" Stinson in that attempted killing.

The trial court also instructed the jury with CALCRIM No. 600 on attempted murder. To find defendant guilty of attempted murder, CALCRIM No. 600 required the jury to find, among other things, that "[t]he defendant intended to kill" the attempted murder victim.

The jury found defendant guilty of attempted murder. Having been instructed with CALCRIM Nos. 401 and 600, the jury could not have convicted defendant without finding that he knew Stinson intended to kill the son, and that defendant intended to aid, facilitate, promote, encourage, or instigate that killing. In other words, these instructions required the jury to find that defendant intended to kill. (See *People v. Lee* (2023) 95 Cal.App.5th 1164, 1191 [assuming the jury convicted the defendant for aiding and abetting an attempted murder, "the jury necessarily found [he] had 'knowledge of the

15

unlawful purpose of the perpetrator,' that being 'a specific intent to kill unlawfully another human being,' and aided and abetted 'with the intent or purpose' of committing the crime"; thus, the jury necessarily found the defendant "intended to aid and abet an unlawful killing, that is, that [he] had an intent to kill, the very definition of express malice"]; *People v. Coley* (2022) 77 Cal.App.5th 539, 547 [discussing CALCRIM No. 600 and stating that, "by finding appellant guilty of attempted murder, the jury necessarily found he had personally harbored intent to kill or express malice when he aided and abetted the" shooting that gave rise to his murder and attempted murder convictions].) The jury's verdicts establish defendant acted as a direct aider and abettor and harbored the intent to kill.

The version of CALCRIM No. 400 given here did not include the "equally guilty" language addressed in *People v. Johnson, supra*, 62 Cal.4th 600, as discussed in *People v. Estrada, supra*, 77 Cal.App.5th at pages 947-948. Thus, like *Estrada*, there is even less of a possibility than in *Johnson* that the jury could have imputed defendant's liability for attempted murder from the mental state of Stinson, the actual shooter. (*Estrada,* at pp. 947-948.) Lastly, the prosecutor did not rely on the natural and probable consequences doctrine in closing argument here.

The record shows defendant was found guilty of attempted murder as a direct aider and abettor, and that the jury found, beyond a reasonable doubt, that defendant harbored the intent to kill. Defendant has not persuaded us that there is any reason to depart from the reasoning in *Estrada* and *Rushing*. (See *People v. Virgen* (2025) 110 Cal.App.5th 440, 454 ["A court's use of CALCRIM No. 400's last paragraph*, by itself,* usually is not sufficient to allow the jury to impute malice to the defendant based only on his or her participation in a crime other than the charged murder, so long as the court properly instructs on direct aiding and abetting principles, and its other instructions require the jury to find the defendant acted with malice aforethought before convicting him or her of murder"].)

16

As relevant here, on its face, section 1172.6 applies only to "attempted murder under the natural and probable consequences doctrine . . . ." (§ 1172.6, subd. (a); see *People v. Coley, supra*, 77 Cal.App.5th at p. 548 [former § 1170.95, which has been renumbered as § 1172.6, applies by its terms only to attempted murders based on the natural and probable consequences doctrine].) Therefore, a section 1172.6 petition for resentencing is "properly denied as to [an] attempted murder conviction . . . if the record affirmatively demonstrates the jury did not rely on the natural and probable consequences doctrine." (*People v. Lovejoy* (2024) 101 Cal.App.5th 860, 865.) The record here affirmatively demonstrates that the jury did not find defendant guilty of attempted murder under the natural and probable consequences doctrine. As such, defendant is ineligible for relief under section 1172.6 as a matter of law.

Because defendant was not convicted under the natural and probable consequences doctrine and is ineligible for section 1172.6 relief as a matter of law, we need not address the parties' arguments concerning whether substantial evidence supported the trial court's determination that defendant was guilty beyond a reasonable doubt of attempted murder as a direct aider and abettor.

III

*The Premeditation Enhancement*

Defendant argues that the premeditation enhancement to the attempted murder charge must be reversed because the instruction, as it applies to a non-perpetrator, violates the Sixth Amendment and is contrary to the principles of Senate Bill No. 1437. "The mere filing of a section [1172.6] petition does not afford the petitioner a new opportunity to raise claims of trial error or attack the sufficiency of the evidence supporting the jury's findings." (*People v. Farfan* (2021) 71 Cal.App.5th 942, 947; see also *People v. DeHuff* (2021) 63 Cal.App.5th 428, 438 [§ 1172.6 does not permit a petitioner to establish eligibility for resentencing based on alleged trial error].)

17

Defendant's contention is not cognizable on his appeal from the denial of his section 1172.6 resentencing petition.

DISPOSITION

The order is affirmed.

_____\s\_____,
Krause, J.

We concur:

_____\s\_____,
Earl, P. J.

_____\s\_____,
Wiseman, J.[*]

---

[*]    Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18